SAMPSON & ASSOCIATES
Bryan D. Sampson, Esq. (#143143)
Mary L. Fickel, Esq. (#221872)
2139 First Avenue
San Diego, California 92101
Tel. (619) 557-9420 / Fax (619) 557-9425

Attorneys for Petitioner
MARIE-LOUISE WEITNAUER

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARIE-LOUISE WEITNAUER, | Case No.: |
| Plaintiff, | **PETITION TO PERPETUATE TESTIMONY** |
| v. | |
| COOLEY GODWARD, LLP;<br>STOEL RIVES, LLP;<br>PARE SURGICAL, INC., a Delaware Corporation;<br>ORCA TECHNOLOGIES, INC., a Utah Corporation;<br>BENOIT DEMEULEMEESTER;<br>EMANUELE PIGNATELLI;<br>CAMCO AG, a Switzerland corporation; and<br>CAMCO HOLDING AG, a Switzerland corporation, | Date:<br>Time:<br>Ctrm: |
| Defendants. | Judge: Hon. |

Petitioner Marie-Louise Weitnauer, specifically states:

## I. PARTIES

1.      Petitioner, Marie-Louise Weitnauer ("Petitioner Weitnauer") is, and at all times relevant was, a citizen of the Republic of Malta.

2.      Petitioner Weitnauer is informed and believes, and based on that information and belief, alleges that Prospective Defendant Cooley Godward, LLP (hereinafter referred to as "COOLEY") is a limited liability partnership, having its principal place of business at One Maritime Plaza, 20th Floor in San Francisco, California 94111, and is subject to the jurisdiction of this Court.

SAMPSON & ASSOCIATES
ATTORNEYS AT LAW
2139 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619)557-9420 – FACSIMILE (619)557-9425

3.     Petitioner Weitnauer is informed and believes, and based on that information and belief, alleges that Prospective Defendant Pare Surgical, Inc. (hereinafter referred to as "PARE") is a Delaware corporation, doing business in San Francisco and having its principal place of business at 7332 South Alton Way, Suite H, Centennial, Colorado 80112, and is subject to the jurisdiction of this Court.

4.     Petitioner Weitnauer is informed and believes, and based on that information and belief, alleges that Prospective Defendant Stoel Rives, LLP (hereinafter referred to as "STOEL"), is a limited liability partnership, doing business in San Francisco and having its principal place of business at 600 University Street, Suite 3600 in Seattle, Washington 98101, and is subject to the jurisdiction of this Court.

5.     Petitioner Weitnauer is informed and believes, and based on that information and belief, alleges that Prospective Defendant Orca Technologies, Inc. (hereinafter referred to as "ORCA") is a corporation incorporated under the laws of Utah, doing business in San Francisco and having its principal place of business at 24000 35th Avenue South East in Bothell, Washington 98021, and is subject to the jurisdiction of this Court.

6.     Petitioner Weitnauer is informed and believes, and based on that information and belief, alleges that Prospective Defendant Benoit Demeulemeester (hereinafter referred to as "BENOIT DEMEULEMEESTER") is, and at all times relevant was, a citizen of the country of Switzerland.

7.     Petitioner Weitnauer is informed and believes, and based on that information and belief, alleges that Prospective Defendant Emanuele Pignatelli (hereinafter referred to as "EMANUELE PIGNATELLI") is, and at all times relevant was, a citizen of the country of Switzerland.

8.     Petitioner Weitnauer is informed and believes, and based on that information and belief, alleges that Prospective Defendant Camco AG ("hereinafter referred to as "CAMCO AG ") is a corporation incorporated under the laws of Switzerland having its principal place of business in Zurich, Switzerland.

9.     Petitioner Weitnauer is informed and believes, and based on that information and belief, alleges that Prospective Defendant Camco Holding AG (hereinafter referred to as "CAMCO HOLDING AG") is a corporation incorporated under the laws of Switzerland, doing business in San Franscisco and having its principal place of business in Zurich, Switzerland.

SAMPSON & ASSOCIATES
ATTORNEYS AT LAW
2139 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619)557-9420 • FACSIMILE (619)557-9425

SAMPSON & ASSOCIATES
ATTORNEYS AT LAW
2139 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619)557-9420 • FACSIMILE (619)557-9425

## II. JURISDICTION AND VENUE

10.     This action is a civil action of which this Court has original jurisdiction under 28 U.S.C. §1332. The civil action is between citizens of different States and citizens of foreign states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.     Venue is further appropriate in this Court under 28 U.S.C. §1391(a)(2). Prospective Defendants, and each of them, were doing business in San Francisco, California, the subject funds were transferred through bank accounts in San Francisco and the wrongful acts alleged to have been committed by Prospective Defendants, and each of them, occurred in the Northern District of California, i.e. San Francisco County, California.

## III. FACTUAL BACKGROUND

12.     Petitioner Weitnauer intends to file a complaint in this Court against Prospective Defendants to recover damages for common law fraud, embezzlement, breach of fiduciary duty and conversion.

13.     In or about May 2000, Prospective Defendants DEMEULEMEESTER and PIGNATELLI set up Prospective Defendant corporation CAMCO AG, an asset management company, through Prospective Defendant corporation CAMCO HOLDING AG.

14.     Prospective Defendants DEMEULEMEESTER and PIGNATELLI were directors and the only authorized signatories of CAMCO AG for the relevant time period.

15.     In approximately 1993 Petitioner Weitnauer's daughter married Prospective Defendant DEMEULEMEESTER.

16.     In approximately 1994, shortly after the marriage, Prospective Defendant DEMEULEMEESTER persuaded Petitioner Weitnauer to entrust her fortune to Prospective Defendant CAMCO AG insisting that the company had a conservative management policy.

17.     On or about July 1994 Petitioner Weitnauer signed a contract granting Prospective Defendant CAMCO AG authority to manage Petitioner Weitnauer's assets.

18.     The contract did not, however, empower Prospective Defendants DEMEULEMEESTER or CAMCO AG to withdraw or transfer Petitioner Weitnauer's funds without her signatory consent.

/ / /

19.   Prospective Defendant DEMEULEMEESTER persuaded Petitioner Weitnauer to open a bank account with the Zurich Branch of the Geneva private bank Lombard Odier & Cie.

20.   On or about July 19, 1994, Petitioner Weitnauer opened a bank account ("Account 01220") with the above mentioned bank and deposited approximately six million Swiss Francs, approximately $4,500,000 U.S. dollars.

21.   In or about 1994, Petitioner Weitnauer instructed the bank to send all banking correspondence to Prospective Defendant CAMCO AG.

22.   On or about August 8, 1998, Prospective Defendant DEMEULEMEESTER orally represented to Petitioner Weitnauer an investment opportunity into Prospective Defendant PARE for the development of a medical device.

23.   That same day, Petitioner Weitnauer, relying on Prospective Defendant DEMEULEMEESTER's representation, signed banking instructions for Account 01220 to transfer $300,000 U.S. to the trust account of Prospective Defendant Cooley Godward, LLP, based in San Francisco, on an account with the Pacific Bank in San Francisco.

24.   The banking instructions Petitioner Weitnauer signed made a written reference to Prospective Defendant PARE.

25.   Petitioner Weitnauer learned that Prospective Defendant COOLEY transferred the $300,000 U.S. to Gibraltar Private Bank, account number W 2902.

26.   Petitioner Weitnauer further learned that the real beneficial owners of the account number W 2902 at Gibraltar Private Bank were Prospective Defendants DEMEULEMEESTER and PIGNATELLI. Petitioner Weitnauer would not have signed the banking instructions had she known that Prospective Defendants DEMEULEMEESTER and PIGNATELLI were the real beneficial owners of the account.

27.   On or about May 4, 1999, Prospective Defendant DEMEULEMEESTER transferred $60,000 U.S. from Petitioner Weitnauer's Account 01220 to through the trust account of Prospective Defendant STOEL to Key Bank in favor of a Washington corporation, Orca Technologies Inc., without Petitioner Weitnauer's signatory consent.

/ / /

SAMPSON & ASSOCIATES
ATTORNEYS AT LAW
2139 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619)557-9420 • FACSIMILE (619)557-9425

PETITION TO PERPETUATE TESTIMONY
S:\Company Files\Clients - Potential\Weitnauer\Weitnauer\Pleading\Pet.Testimony\Petition.wpd

28.     Again, on or about May 27, 1999, Prospective Defendant DEMEULEMEESTER transferred $120,000 U.S. from Petitioner Weitnauer's Account 01220 through the trust account of Prospective Defendant STOEL to Key Bank in favor of Orca Technologies Inc., without Petitioner Weitnauer's signatory consent.

29.     On or about June 14, 1999, and for a third time, Prospective Defendant DEMEULEMEESTER transferred $135,000 U.S. from Petitioner Weitnauer's Account 01220 through the trust account of Prospective Defendant STOEL to Key Bank in favor of Orca Technologies Inc., without Petitioner Weitnauer's signatory consent.

30.     Petitioner Weitnauer learned that Prospective Defendant DEMEULEMEESTER tricked his wife, Petitioner Weitnauer's daughter, into signing the banking instructions for the transfers to Orca Technologies Inc. Prospective Defendant DEMEULEMEESTER obtained his wife's signature for the transfers by falsely representing to his wife that the banking instructions were for his wife's own account, which he also managed through Prospective Defendant CAMCO AG.

31.     On or about June 30, 1999, Prospective Defendant DEMEULEMEESTER again transferred $120,000 U.S. from Petitioner Weitnauer's Account 01220 through the trust account of Prospective Defendant STOEL to Key Bank in favor of Orca Technologies, Inc. without Petitioner Weitnauer's signatory consent. Prospective Defendant DEMEULEMEESTER counterfeited Petitioner Weitnauer's signature on the banking instructions for this transfer.

32.     On or about December 31, 2000, Petitioner Weitnauer learned that all monies transferred from her Account 01220 to Key Bank in favor of Prospective Defendant ORCA were transferred to Account W 2902 at Gibraltar Private Bank by Prospective Defendant CAMCO AG.

33.     Petitioner Weitnauer subsequently learned Prospective Defendant DEMEULEMEESTER was a Director of Orca Technologies Inc., that Orca Technologies, Inc. was nearly bankrupt, out of business and was officially de-listed from NASDAQ in 1999. See Exhibit "1," pg. 44 of 57.

34.     On or about December 21, 1999; June 14, 2000; July 3, 2000; October 24, 2000 and March 19, 2001, Prospective Defendant DEMEULEMEESTER transferred $300,000 U.S.; $150,000 U.S; $300,000 U.S.; $100,000 U.S. and $125,000, U.S., respectively, from Petitioner Weitnauer's Account 01220 to Gibraltar Private Bank in favor of Account W 2902, without Petitioner's signatory consent.

SAMPSON & ASSOCIATES
ATTORNEYS AT LAW
2139 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619)557-9420 · FACSIMILE (619)557-9425

35. Prospective Defendant DEMEULEMEESTER again had his wife, Petitioner Weitnauer's daughter, sign the banking instructions for the above transfers. Once again, Prospective Defendant DEMEULEMEESTER falsely represented to his wife that the banking instructions were for his wife's own account.

36. In or about the summer of 2003, Prospective Defendant DEMEULEMEESTER purchased junk bonds deposited in Petitioner Weitnauer's daughter's account, whose value was near $0.00 U.S., for Petitioner Weitnauer's Account 01220 for $50,000 U.S.

37. In or about the autumn of 2003, Petitioner Weitnauer's daughter learned of the deception and alerted Petitioner that Prospective Defendants DEMEULEMEESTER and CAMCO AG had mismanaged Petitioner Weitnauer's account.

38. Thereafter, Petitioner Weitnauer requested from the bank and Prospective Defendants DEMEULEMEESTER and CAMCO AG all documents relating to the transactions conducted on her account for the period of approximately July 1994 to August 2003.

39. Based on the documents Petitioner Weitnauer received, Petitioner Weitnauer realized that she lost approximately 70% of her capital.

40. Petitioner Weitnauer immediately cancelled the contract with Prospective Defendant CAMCO AG. However, Petitioner Weitnauer sustained damages in the amount of $1,760,000 U.S.

### III. BASIS FOR REQUEST

41. Immediate deposition testimony is necessary because Prospective Defendant PARE does not appear to be an active business entity. Pursuant to California Rules of Professional Conduct, Rule 4-100(B)(3), Prospective Defendant COOLEY is permitted to destroy records after five years has elapsed. Accordingly, there is a substantial likelihood that the financial records regarding the transactions from Petitioner Weitnauer's Account 01220 to the trust account of Prospective Defendant COOLEY, which COOLEY subsequently transferred to Gibraltar Private Bank in favor of Account W 2902, will be destroyed and forever lost.

42. Immediate deposition testimony is necessary because Prospective Defendant ORCA was de-listed from the NASDAQ exchange in 1999. Prospective Defendant ORCA stopped doing business in 1999. Pursuant to Washington Rules of Professional Conduct, Rule 1.14, Prospective Defendant

1 STOEL is not required to maintain records for a set period of time. Accordingly, there is a substantial

2 likelihood that the financial records regarding the transactions from Petitioner Weitnauer's Account

3 01220 to the trust account of Prospective Defendant STOEL, which STOEL subsequently transferred

4 to Key Bank that was again transferred to Gibraltar Private Bank in favor of Account W 2902, will be

5 destroyed and forever lost.

6 43. Petitioner Weitnauer desires to perpetuate the testimony of Prospective Defendant

7 COOLEY. The substance of COOLEY'S testimony will be all documents that relate to transactions

8 from Petitioner Weitnauer's Account 01220 to the trust account of Prospective Defendant COOLEY

9 and subsequent transfers of those funds.

10 44. Petitioner Weitnauer desires to perpetuate the testimony of Prospective Defendant

11 STOEL. The substance of STOEL'S testimony will be all documents that relate to transactions from

12 Petitioner Weitnauer's Account 01220 to the trust account of Prospective Defendant STOEL and

13 subsequent transfers of those funds.

14 **PRAYER**

15 WHEREFORE, Petitioner Weitnauer prays the Court for an order authorizing:

16 1. Production of all documents in the possession, custody or control of Prospective

17 Defendant COOLEY, GODWARD, LLC that relate to transactions from Petitioner Weitnauer's

18 Account 01220 to the trust account of Prospective Defendant COOLEY for the purpose of perpetuating

19 its testimony pursuant to Rule 27 of the Federal Rules of Civil Procedure.

20 2. Production of all documents in the possession, custody or control of Prospective

21 Defendant COOLEY, GODWARD, LLC that relate to transfers of trust account funds that originated

22 from Petitioner Weitnauer's Account 01220 for the purpose of perpetuating its testimony pursuant to

23 Rule 27 of the Federal Rules of Civil Procedure.

24 3. Production of all documents in the possession, custody or control of Prospective

25 Defendant STOEL RIVES, LLP that relate to transactions from Petitioner Weitnauer's Account 01220

26 to the trust account of Prospective Defendant STOEL for the purpose of perpetuating its testimony

27 pursuant to Rule 27 of the Federal Rules of Civil Procedure.

28 ///

PETITION TO PERPETUATE TESTIMONY
S:\Company Files\Clients - Potential\Weitnauer\Weitnauer\Pleading\Pet.Testimony\Petition.wpd

SAMPSON & ASSOCIATES
ATTORNEYS AT LAW
2139 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619)557-9420 – FACSIMILE (619)557-9425

1    4.    Production of all documents in the possession, custody or control of Prospective

2  Defendant COOLEY, GODWARD, LLC that relate to transfers of trust account funds that originated

3  from Petitioner Weitnauer's Account 01220 for the purpose of perpetuating its testimony pursuant to

4  Rule 27 of the Federal Rules of Civil Procedure.

5                                                        Respectfully submitted,

6  Dated: December **27,** 2004                SAMPSON & ASSOCIATES

7

8                                      By: Bryan D. Sampson, Esq.
                                            Attorneys for Petitioner

9                                           Marie-Louise Weitnauer

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SAMPSON & ASSOCIATES
ATTORNEYS AT LAW
109 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619)557-9420 • FACSIMILE (619)557-9425

PETITION TO PERPETUATE TESTIMONY
S:\Company Files\Clients - Potential\Weitnauer\Weitnauer\Pending\Pet.Testimony\Petition.wpd

EXHIBIT "1"

```
-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
 MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
 TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
 QFL0OlYCt/vuGrd+lrImQJYB2sM/7rtIPYll8mD35YwLklva0US+ihEjIkATDZfZ
 Tzmvn9Y1/Tc8IR/d78TECw==

<SEC-DOCUMENT>0000927356-98-001647.txt : 19981015
<SEC-HEADER>0000927356-98-001647.hdr.sgml : 19981015
ACCESSION NUMBER:               0000927356-98-001647
CONFORMED SUBMISSION TYPE:      10KSB/A
PUBLIC DOCUMENT COUNT:          2
CONFORMED PERIOD OF REPORT:     19980630
FILED AS OF DATE:               19981014
SROS:               NONE


FILER:


        COMPANY DATA:
                COMPANY CONFORMED NAME:          ORCA TECHNOLOGIES INC
                CENTRAL INDEX KEY:               0001004932
                STANDARD INDUSTRIAL CLASSIFICATION:  TELEPHONE & TELEGRAPH APPARA
                IRS NUMBER:                      870368236
                STATE OF INCORPORATION:          UT
                FISCAL YEAR END:                 0630

        FILING VALUES:
                FORM TYPE:               10KSB/A
                SEC ACT:
                SEC FILE NUMBER:         000-27390
                FILM NUMBER:             98725105

        BUSINESS ADDRESS:
                STREET 1:                STE 200
                STREET 2:                24000 35TH AVENUE S E
                CITY:                    BOTHELL
                STATE:                   WA
                ZIP:                     98021
                BUSINESS PHONE:          4253541600

        MAIL ADDRESS:
                STREET 1:                24000 35TH AVENUE S E
                STREET 2:                STE 200
                CITY:                    BOTHELL
                STATE:                   WA
                ZIP:                     98021

        FORMER COMPANY:
                FORMER CONFORMED NAME:   JUNGLE STREET INC
                DATE OF NAME CHANGE:     19951214
</SEC-HEADER>
<DOCUMENT>
<TYPE>10KSB/A
<SEQUENCE>1
<DESCRIPTION>ANNUAL REPORT
<TEXT>
```

<PAGE>

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

FORM 10-KSB/A

[X]  Annual report under section 13 or 15(d) of the Securities Exchange Act of
     1934 for the fiscal year ended June 30, 1998

[ ]  Transition report under section 13 or 15(d) of the Securities Exchange
     Act of 1934 for the transition period from _____ to _____

Commission file number 0-27390

ORCA TECHNOLOGIES, INC.
(Name of small business issuer in its charter)

          Utah                               87-0368236
(State or other jurisdiction of        (I.R.S. Employer Identification No.)
incorporation or organization)

24000 35th Avenue, SE, Suite 200
Bothell, Washington 98021
(425) 354-1600
(Address and telephone number of principal executive offices)

Securities registered under Section 12(b) of the Exchange Act:  None

Securities registered under Section 12(g) of the Exchange Act:  Common Stock,
$.001 par value

Check whether the issuer (1) filed all reports required to be filed by Section
13 or 15(d) of the Securities Exchange Act during the past 12 months (or for
such shorter period that the registrant was required to file such reports), and
(2) has been subject to such filing requirements for the past 90 days.

Yes   X   No ___

Check if there is no disclosure of delinquent filers in response to Item 405 of
Regulation S-B contained in this form, and no disclosure will be contained, to
the best of registrant's knowledge, in definitive proxy or information
statements incorporated by reference in Part III of this Form 10-KSB or any
amendment to this Form 10-KSB. |X|

Incorporation by Reference. The issuer hereby incorporates by reference the
Company's 1998 Proxy Statement into Items 10; 11 and 12 of Part III of this
Report on form 10-KSB. The Proxy Statement will be provided to stockholders
subsequent to the filing of this Report.

The issuer's revenues from continuing operations for its most recent fiscal year
were $0.

The aggregate market value of the voting stock held by non-affiliates, based on
the closing price for the registrant's Common Stock on the Nasdaq Electronic
Bulletin Board, as of October 7, 1998, was $8,045,112.

The number of shares outstanding of the issuer's Common Stock, as of October 7,
1998 was 12,778,407 shares.

Transitional small business disclosure format (check one):  Yes [  ] No [X]

<PAGE>

PART I

Preliminary Note Regarding Forward-looking Statements

     The information set forth in this report in Item 1 - "Description of
Business" and in Item 6 - "Management's Discussion and Analysis or Plan of
Operation" includes "forward-looking statements" within the meaning of Section
27A of the Securities Act of 1933, as amended, and Section 21E of the Securities
Exchange Act of 1934, as amended (the "Exchange Act"), and is subject to the
safe harbor created by those sections. Certain factors that realistically could
cause results to differ materially from those projected in the forward-looking
statements are set forth in Item 1 - "Considerations Related to the Company's
Business."

Item 1.  Description of Business

General

     The Company provides products and value-added services in the information
access and home health care management industry.  Highly productive information
management systems that are insensitive to distance and location and designed to
solve defined business problems are urgently needed in many markets.  Customers
will often pay a premium for significant gains in productivity, but require
seamless product-network integration in return.  The Company seeks to deliver
turnkey, application-rich proprietary products to fast growth market niches.
The Company's primary focus is in the home health care market.  Prior to
September 1998, the Company also provided Internet access and related services
in the Northwest area of the United States.  The Company divested itself of the
Internet access business that comprised its Network Services Group in September
1998.  The Company's stated mission is to institutionalize the management of
information with custom software products and services that immediately deliver
both efficiency and quality to its customers.

     As a result of a recent restructuring, the Company has determined it will
focus its business activities on providing software application solutions,
offering proprietary software applications that provide efficience and
compliance with government mandated regulations.  In connection with its
restructuring, the Company accomplished several key goals:

          .    Assimilation of a completely new management team

          .    Completion of two key strategic acquisitions

          .    Closing of equity financing

          .    Execution of a debt-for-equity swap which eliminated approximately
               $3.3 million in corporate obligations

          .    Sale of its Network Services Group

          .    Introduction of its primary product line, CuraSys(TM), to the
               healthcare industry

<PAGE>

The 1998 Acquisitions

     MONITRx.  In February 1998, the Company acquired substantially all of the
assets and assumed certain liabilities of MONITRx Corporation, a California
corporation, through a wholly owned subsidiary now conducting business under the
name MONITRx, Inc. ("MONITRx").  In consideration for the purchase, the Company
issued 1,200,000 restricted shares of the Company's Common Stock.

     DNA.  In February 1998, the Company also acquired substantially all of the
assets, and assumed certain liabilities of DNA, through a wholly owned
subsidiary.  In consideration for the purchase, the Company issued 111,000
restricted shares of the Company's unregistered Common Stock.  Subsequent to the
closing, the Company's subsidiary changed its name to Digital Networks
Associates, Inc.  DNA conducts its business out of offices located in Costa
Mesa, California.

     The Company's acquisitions and the discontinued Internet access business of
the Company placed a significant burden on its management, financial and other
resources.  Past and future acquisitions may subject the Company to additional
risks, including risks relating to integrating and managing the operations and
personnel of acquired companies, and maintaining and implementing uniform
standards, controls, procedures and policies.  The success of future
acquisitions will depend in part upon the Company's ability to assess and manage
the risks typically associated with acquisitions, including the risks of
assessing the values, strengths and weaknesses of acquisition candidates or new
products, possible diversion of management attention from the Company's existing
businesses, reduction of cash, disruption of product development cycles,
dilution of earnings per share, or other factors.  A failure to achieve or
sustain the anticipated benefits of any acquisition could result in that
acquisition having a detrimental effect on the Company's results of operation,
cash flow and financial position.

Products

     Orca develops and markets information technology products and services to
the "alternate site" healthcare marketplace.  This includes home healthcare,
extended care facilities, nursing and acute care facilities (such as hospitals).
The initial product line, CuraSys(TM), is a software application that fully
automates both the field-based and the administrative operations of the health
care customer.  All applications within the CuraSys system provide workflow-
based management capability through a proprietary means by defining and
automating clinical processes rather than by providing a system that merely
collects and prints billing claims.  The CuraSys product line uses a patented
means of collecting detailed patient care data that, when aggregated, provides
for significant clinical diagnoses and analyses, and  mitigates both financial
and regulatory risks for the users of the system.  The Company has engineered
all applications with the system using reliable, scalable, best-of-breed
technologies.  The Company believes these features enhance its goal of becoming
a leader in this new business sector.  The newly assembled management includes a
capable team with over 17 years of successful operating experience in the
alternative site healthcare market, whose work has been characterized by their
innovation and contributions to the growth of the market.

     With the acquisition of MONITRx, the Company acquired a suite of powerful
applications focused on driving the business of improving quality patient care

through advanced network-based products and services.  The strategic premise of the effort was to develop and validate that through providing "point-of-care" automation to field-based care providers (nurses, therapists, aides, etc.), home healthcare agencies are expected to realize significant and immediate gains in operating efficiency.  The prototype of the product was tested in a pilot program at the Fremont, California branch of Coram Healthcare, Inc.  Coram is a major US home healthcare agency located in the San Francisco Bay Area.  The results of the pilot program were generally very positive.

The home healthcare market has been characterized by inefficient operating practices.  The inefficient nature of the market developed in large part as a result of an overall lack of payer-based incentives because

<PAGE>

of heavy subsidies paid by government reimbursement programs through HCFA and Medicare. As a result of government mandates, however, home healthcare providers have now been forced to accept a radical, risk-based, reimbursement environment called the "Prospective Payment System." To remain profitable under the Prospective Payment System, home healthcare agencies must find a way to cut operating costs by as much as 35% while continuing to show that they consistently provide quality patient care. The Company believes the opportunity to assist these providers with new technology provides a market for its CuraSys products.

The Company's suite of network-based software products is marketed under the CuraSys(TM) brand name.  The hallmark of the suite is its use of advanced technologies to deliver information and analysis to assist home healthcare agencies achieve rapid efficiency in their operations.  The products become especially efficient when linked with the Company's ORCANet Intranet technologies.

According to studies conducted by the Company with cooperation of prospective customers, the use of the Company's products reduces operating costs as a result of the following:

  .   Providing home healthcare agency operations managers with a detailed understanding of the clinical, operational and economic procedures will effectively bring the desired outcome of treatment.

  .   Defining risks to both clinical efficacy and profitability.

  .   Increasing operating efficiency through the dissemination of effective standardized, disease-based, operating procedures to all users of the system.

  .   Eliminating inefficient labor intensive, paper-based operating procedures and transcription costs.

  .   Dramatically reducing Days Services Outstanding by assuring that all documentation required for payer reimbursement is available for submission in a timely fashion immediately following completion of reimbursable services.

Due to the open, network-based architecture of the Company's products, there is a significant opportunity for integrating physicians, payers and other customer business partners via the ORCANet into the CuraSys products.  These

applications will take advantage of low-cost, rapidly developed, browser-based technologies which access patient care data at customer sites via the ORCANet.

The most significant competitor of the Company is HBO & Co., a billion-dollar healthcare information systems company. Both HBO and the Company are introducing similarly staged products into the marketplace. The market is estimated to consist of 15,000 home healthcare agencies, with a total penetration of less than 20%. The home healthcare market in the US provides post-acute care patient services through a number of delivery segments. The majority of market activity involves providing care for post-operative, geriatric, terminal and chronically ill patients outside hospitals. Organizations serving the market are both for-profit and not-for-profit and range in scale from single site community-based nursing agencies to national for-profit managed care organizations. In total, the market currently maintains over 15,000 registered home healthcare agencies in the following market segments:

- Local Home Nursing Agencies

- Regional Home Healthcare Agencies

- Regional Managed Care Organizations


Page 4 of 57

<PAGE>

- Hospital-based Home Healthcare Agencies

- National Home Healthcare Agencies

- National Managed Care Organizations

The market receives most of its revenues from the US Health Care Financing Administration (HCFA) as entitlements delivered under the Medicare/Medicaid programs or from commercial insurers and managed care organizations. This market represents the fastest growing segment of the US healthcare industry, estimated at approximately 22% per year. This is evidenced in part by the growth in annual reimbursements from $4 billion in 1990 to almost $20 billion in 1996 through Medicare/Medicaid alone. The rapid growth of the industry is driven by:

- Lower home care costs (approximately 60% below hospital-based care for similar services).

- A trend toward earlier discharge of patients from hospitals and other critical care environments.

- Trends in payer reimbursement in critical care settings toward negotiated group contract (capitation) or risk-based episodic models.

- The overall aging of the US population.

- Improved technology in acute care.

Since the mid-1980's, Medicare, HCFA and other payers have worked to revise the reimbursement structure of the home healthcare market. The market has evolved from a virtual cottage business to a $25 billion industry in less than 20 years. As the factors affecting growth discussed above began to affect institutional healthcare in the late 1970's, home care was viewed as an

effective means of providing medical care to patients who would normally require
weeks or months of recovery from acute care situations in a hospital setting.
Subsequently, demand for home care services increased dramatically and within a
few years, thousands of home care organizations were developed and licensed
annually.

     The typical home healthcare agency consists of field-based nurses, aids and
therapists managed by a central administration and operations management
resources.  An agency can be either a single location or may be comprised of a
number of branch locations.  Business is derived through contracts with local
hospitals or managed care providers to accept patients discharged by these
providers for care in their own home or in sub-acute or extended care
facilities.  Agencies also contract with pharmacies, medical supply and
equipment companies, specialty care agencies, and other service providers to
adequately supply and deliver care to their patients.

     With the rapid growth of the market in the 1980's, HCFA experienced
difficulty in preventing fraud and abuse in the reimbursement system.  The
problems of the system were compounded by the practice of enforcing a largely
paper-based system of establishing the basis for reimbursement.  The system
required that all participants in the continuum of care (Medicare, physicians,
home healthcare agencies, and individual care providers) manage hundreds of
thousands of handwritten notes documenting and proving that the care authorized
to be delivered to a patient was actually provided as prescribed within an
established plan of treatment.  In the mid-1980's, the US government began to
investigate incidents of flagrant abuses and, in a number of highly publicized
cases, aggressively prosecuted numerous high profile agencies for blatant fraud
and abuse of the Medicare/Medicaid system.

                              Page 5 of 57
<PAGE>

     In the wake of these investigations, HCFA began implemented a series of
ill-fated policies that ultimately failed to provide adequate economic
incentives for home healthcare agencies to become efficient.  The Federal
Government also instituted heavy handed enforcement tactics (e.g., "Operation
Restore Trust") in an effort to use fines and criminal liability to encourage
institution of controls and elimination of fraud and abuse.  Finally, as a
result of cost-cutting measures affecting HCFA as part of the Balanced Budget
Act of 1996, HCFA announced its intent to proceed with a revised reimbursement
program referred to as the "Prospective Payment System" ("PPS").  Under the PPS
, HCFA determined to provide home healthcare agencies with fixed reimbursement
based on the nature of the disease of the patient and the desired outcome of the
treatment for the disease.  This model is similar to the earlier DRG program
used to control hospital treatment costs which in many ways spawned the rapid
growth of home health care by prompting hospitals to discharge patients earlier
and to move many traditional hospital-based treatment programs to home agencies.

     Under the PPS, a patient is referred to a home healthcare agency to be
treated for a specific disease or group of diseases.  Based on national averages
identified by HCFA, the agency is provided with an initial distribution that
would cover the costs to treat the disease for a fixed period of time and/or
arrive at the desired treatment goals defined for the patient's care.  The
agency must provide data supporting that the claim that the care being provided
is based on recognized quality standards and that the patient was actually
satisfied with the care received.  The PPS has been implemented under pilot
programs in 150 agencies nationwide.  The purpose of the pilot is to provide
standard cost data needed to fully implement the program within 2 years.  In
October 1997, HCFA announced the implementation of the Interim Payment System or
IPS, which took effect in January 1998.  Under the IPS, a mandatory 15%

reduction was implemented in all HCFA reimbursement to home healthcare providers treating patients within the Medicare system. The industry views this as an indication that full implementation of the PPS is expected and that the industry must modernize and become more efficient if it is to continue to be profitable.

Despite the rapid technical advancements in many industries, the home healthcare industry has been relatively slow to modernize its information technology. Less than 20% of the market currently relies on information technology of any kind to automate operations. A recent study confirmed this when it reported that in 1995 less than 1% of all home healthcare visits were performed using information technology to collect patient care and field operational data interactively within the process of providing care. The traditional reason for this lack of information technology and infrastructure has been the lack of economic motivation for the market to become more efficient and competitive. This has now changed with the moves to cut reimbursement described above.

The trends in the home healthcare market described above were the genesis for the Company's CuraSys products. CuraSys is designed to provide home healthcare agencies and other customers a world class information system based on simple to use applications utilizing commercial grade technologies. The system includes:

.    A scalable, system-wide network-based client/server open systems architecture based on industry standard Windows-95(R) and Windows NT(R) operating systems.

.    Cost effective data networks that can be both sized dynamically according to the needs of each customer and branch as well as used to provide value added services to customers and business partners that include physicians and payers as well as home healthcare agencies.

.    Relational Database Management Systems (RDBMs) to collect, store, analyze, and report branch, agency, and system-wide information.

.    Proven development tools such as PowerBuilder and C++ that provide rapid and efficient production of stable software systems.


Page 6 of 57

<PAGE>

.    Administrative and management functions to adequately and effectively support the system's growth and expansion over time.

Pilots using the system have determined that it greatly increases efficacy and productivity of agency operations. The bulk of the savings defined were found as a result of driving inefficient, paper-based work processes out of the daily operations of the organizations studied. The potential cost savings provide customers with the ability to reduce both field-based and back office labor costs and to increase patient population and revenues as a result.

The products are marketed through a number of channels. Primarily, Orca employs a regional outside direct sales team focused on defined geographic markets and niche segments. In addition to direct sales, the Company is also in the process of launching a comprehensive VAR and channel marketing program that will be offered to large consulting firms, management companies and technology marketing agencies.

CuraSys is presently installed at three strategic sites nationwide. Each

location represents a specific segment of the market. The Company has recently expanded its sales force and hired 4-5 regional sales managers prior to the end of July 1998. Advertising and promotional campaigns are expected to support the sales expansion effort of the Company by increasing name and product recognition for the CuraSys products and services.

There are a number of companies that have entered the market with technology designed to facilitate gathering and analysis of information required for administration of home healthcare agencies. Administration services include resource/patient scheduling, clinical operations, admissions and billing functions. These systems have been in existence for a number of years and provide basic value for their designed operations. At present there are very few entrants capable of providing a viable product aimed at capturing and analyzing operational and clinical data taken at the primary site of care. Other companies that provide these "back office" systems (i.e., HBO & Co., Delta Health Systems, InfoMed) have also developed or acquired point-of-care technologies as add-on applications to their existing systems. The typical approach has been to develop software that can be used by care providers via notebook or laptop computer. In general, however, these systems have been poorly received and market penetration has been limited. The major objections of the customers have included high capital investments required for installation of these systems and, more fundamentally, the resistance of the nursing community to laptop computers. To use these systems, the provider must master basic computer skills for input of data and must learn more sophisticated tasks such as use of modems for downloading and uploading records. These systems also tend to reflect biases of their highly technical designers and often are developed in terms and logic that are not easily assimilated by the end user. The Company is not aware of any such systems that are in significant actual use.

One competitor has emerged with the first non-PC-based system for this market. Patient Care Technologies, Inc., has developed this product utilizing a Data General "hammer head" style hand-held unit or keypad. The Company views Patient Care as its primary potential competitor, but believes its strategy and the connection with the Company's own Network Services Group provide a means for effectively competing in the market. However, there is no assurance that this is the case.

The Company has two patent filings now pending before the US Patent Office relating to the CuraSys system. In addition, the Company has a design patent (US serial no. 29 043 280) and a utility patent (US serial no. 08 549 415).

Employees

The Company has 47 full-time employees as of October 7, 1998.

Page 7 of 57

<PAGE>

Recent Developments

Restructuring Agreement. On April 27, 1998, the Company entered an
------------------------
agreement with Pacific Aerospace & Electronics, Inc. ("PA&E") to convert $4,219,000 owed under certain notes into shares of the Company's Common Stock at $2.00 per share (the "Restructuring Agreement"). The Company also granted PA&E demand registration rights for those shares and, in the event of an underwritten public offering, piggyback registration rights, which will be effective the earliest of: (a) the closing of a third round of financing by the Company, or (b) the first anniversary of the closing of the Restructuring Agreement. In

addition, PA&E agreed to continue to guarantee a $1.3 million loan with a
commercial lender and an equipment lease, subject to certain mutually acceptable
time limitations.

As an inducement to have PA&E convert the debt to equity, the Company also
acquired a note and all related interests of PA&E in an Internet service
provider, including the rights and claims of PA&E in certain litigation
involving that company. The Company also joined in filing an involuntary
bankruptcy proceeding against that company in March 1998. Included in the rights
acquired by the Company is a Common Stock purchase warrant that entitles the
Company to purchase 12.5% of the Internet service provider's fully diluted
Common Stock. The purchase price due PA&E for these rights and interests is
$950,000, payable over five years under a promissory note, with interest at the
rate of 8% per annum. Under the note, Orca will pay interest only for the first
year (commencing March 1, 1998), and will make fully amortizing monthly payments
of principal plus interest for the final four years of the note term. The
Company sold these rights and obligations with its own Internet services
business in September 1998.

Divestiture of Televar.  In September 1998, the Company sold the Internet
----------------------
access business of its wholly owned subsidiary, Televar, Inc. ("Televar"). The
sale included all assets of Televar used in the Internet access business as well
as the rights and interests relating to the Internet service provider acquired
from PA&E described above. Under the terms of the agreement for the sale of
Televar assets, the buyer assumed certain liabilities of the Company related to
the Televar business and paid the Company cash of $300,000. The buyer also
agreed to assume trade accounts payable, leases and certain employee-related
expenses.  The Company had earlier agreed to
acquire the buyer, but determined that a divestiture of the Internet service
business was more consistent with the future objectives of the Company. With the
divestiture of the Televar assets, the Company ceased operations in the Internet
access and services industry.

Considerations Related to the Company's Business

The business of the Company is subject to risks, many of which are outside
the control of the Company.  These risks may cause the operating results and
financial condition of the Company to differ from the Company's own
expectations.  The following factors should be considered in evaluating the
Company's business and operations:

Limited Operating History, Operating Losses

The Company has had a limited operating history in the healthcare
information industry.  Although the Company has experienced recent growth in
revenues, it experienced net losses of each of the last four fiscal years.
Furthermore, much of the revenue from past years was generated by the Company's
Internet access services business which was sold in September 1998.  The
Company's current focus is on developing its alternate site medical information
products and marketing them.  Notwithstanding cost-saving measures that the
Company has implemented, which include its divestiture of Televar, it expects
for the foreseeable future to continue to incur net losses.  There is no
assurance that revenue growth will continue or that the Company will in the
future achieve or sustain profitability or positive cash flow from operations.

Need for Additional Capital

<PAGE>

The success of the Company will depend in significant part on its ability to raise additional equity or debt financing, or combination of debt and equity financing, to pay existing obligations, to provide working capital, and to finance operations and potential acquisitions. The Company will be required to seek additional funding from other sources to repay amounts borrowed from PA&E, to repay other debt and to finance its operations. The Company's current working capital sources are insufficient to fund its near-term operations. There is no assurance that the Company will be able to raise additional capital on favorable terms or, if it raises such additional capital, that such financing will be sufficient to permit the Company to operate profitably.

New and Uncertain Market

The market for the Company's products and related services is in an early stage of growth. Because this market is relatively new and because current and future competitors are likely to continue to introduce competing services and products, it is difficult to predict the rate at which the market will grow or at which new or increased competition will result in market saturation. If demand for the Company's products and services fails to grow or grows more slowly than anticipated, or if the market becomes saturated with competitors, the Company's business, operating results and financial condition will be adversely affected.

Technological Change and New Services

The software development business historically has been characterized by rapidly changing technology, frequent new product and service introductions, and evolving industry standards and customer expectations. The Company believes that its future success will depend on its ability to anticipate such changes and to offer on a timely basis services that meet these evolving industry standards and customer requirements. There can be no assurance that the Company can successfully anticipate such changes and develop and bring new products and services to market in a timely manner, or that services or technology developed by others will not render the Company's services and technology noncompetitive or obsolete.

Reimbursement and Cost Containment Policies

Revenues of the Company are derived in part from payments made by entities who depend significantly on reimbursement by third-party payers, including Medicare and Medicaid, private insurance and self-funded employer groups. These payers have implemented, from time to time, and may be expected in the future to implement cost containment measures in an effort to reduce the expense of health care for their insureds. Such measures include establishment of rate schedules and limitations on amounts reimbursed by the insurers and restrictions on the types of therapies, medications and illnesses covered by their insurance or benefit plans. Such policies may adversely affect the business of the Company by reducing or limiting the revenues of its clients and the amount they may have to pay for new technology. The home health care industry generally provides patient treatments and therapies at lower costs to third-party payers than comparable hospital care providers. As a result, home health care providers and suppliers have benefitted from cost containment policies which are intended to encourage the use of home health treatment and care. While the Company believes that the trend in health care reform is toward increasing home health care and managed care programs, the need to reduce health care expense in general may lead to additional limitations on reimbursement levels and cost containment policies affecting the home health care industry. Such limitations, changes in reimbursement levels and other cost containment measures could have a material adverse effect on the Company's business and profitability.

Product Liability and Malpractice Liability; Insurance

    Providers in the health care  industry, including those operating in the
same segments as the Company, are from time to time subject to lawsuits alleging
malpractice, product liability or related legal theories, which have become an
increasingly frequent risk of doing business for physicians, hospitals, and
other medical care providers.  While it is unlikely that any of the Company's
products or services would result in personal injury,

                            Page 9 of 57
<PAGE>

errors in billing or other data processing using the Company's products and
services may occur, resulting in liability for the customer using such product
or service in its own business. The Company currently maintains liability
insurance intended to cover such claims. However, the coverage provided by such
policies in a particular case is subject to acceptance of the claim relating to
such occurrence by the insurance carrier. There can be no assurance that a
particular claim, if asserted, would be covered by the existing policies of
insurance, neither can there be any assurance that the coverage limits of the
policies now maintained by the Company will be adequate, that the Company will,
in the future, be able to continue to maintain or obtain such insurance or that
such insurance will be available to the Company in the future at costs which are
acceptable to the Company or within its ability to afford such coverage. A
successful claim against the Company in excess of any policy limits could have a
material adverse effect upon the business of the Company and upon its financial
condition. The assertion of such claims, regardless of their merit or eventual
outcome also may have a material adverse effect on the Company and its business
reputation and performance.

Competition

    The health care industry is highly competitive and the market is divided
among a large number of providers.  Many of the Company's competitors have or
may obtain significantly greater financial and marketing strength and resources
than the Company.  There can be no assurance that the Company will not encounter
increased competition in the future, which could have a material adverse effect
on the ability of the Company to successfully market its products and services.

Dividend Policy

    The Company has never declared or paid any cash dividends on its Shares and
does not anticipate paying cash dividends in the foreseeable future.  The
payment of dividends to holders of Common Stock may be subject to preferences
granted in the future by the Board of Directors to holders of the Company's
Preferred Stock.

Risks Inherent in Company's Growth Strategy

    The Company may continue to grow and diversify through expanding current
operations or by acquiring existing operations.  This growth strategy entails
the risks inherent in assessing the value, strengths and weaknesses of
acquisition candidates, in integrating and managing the operations of acquired
companies and in identifying suitable locations for additional branch
facilities.  The Company's growth may place significant demands on the Company's
financial and management resources.  There can be no assurance that the Company
will be able to implement its growth strategy or that such strategy will
ultimately prove successful.

Volatility of Stock Prices

     The stock market has from time to time experienced significant price and
volume fluctuations that may be unrelated to the operating performance of
particular companies.  In addition, the market price of the Company's common
stock, like the stock prices of many publicly traded home health care companies,
has been and may continue to be highly volatile.  Announcements of innovations
or new products or services by the Company or its competitors, developments or
disputes concerning proprietary rights, publicity regarding actual or potential
medical results relating to products under development by the Company or its
competitors, regulatory developments in both the U.S. and foreign countries and
economic and other external factors, as well as period-to-period fluctuations in
financial results, may have a significant impact on the market price of the
common stock.


Year 2000 Risks

                         Page 10 of 57
<PAGE>


     Historically, the Company has implemented computer systems for accounting
and financial management, purchasing, research, development and design, and
other purposes. The computer industry recently has recognized that many existing
computer programs, many of which are large, custom-programmed mainframe
applications that have continuously been written and amended over a long time
period and by a variety of different programmers, use only two digits to
identify a year in the date field.  Such programs were designed, developed and
modified without considering the impact of the upcoming change in the century.
If not corrected, many such computer applications could fail or create erroneous
results by or at the year 2000 by erroneously identifying the year "00" as 1900,
rather than 2000.  This problem has become known, among other names, as the
"Year 2000" problem.  Correcting a Year 2000 problem on a large mainframe or
network application, however, can be difficult and expensive.  In many cases,
the original developer of the subject software is either defunct or otherwise
unable or unwilling to address the problem.  Moreover, because many individuals
may have programmed different pieces of a program, and some of them may have
died or cannot be located, many companies will be forced to review the code
comprising their software on a line-by-line basis, which can take enormous
amounts of time and significant financial resources.  The Year 2000 issue
affects virtually all companies and organizations, including the Company.  If a
company does not successfully address its Year 2000 issues, it may face material
adverse consequences. The Company is in the process of insuring that its
internal computer systems are Year 2000 compliant.  The Company's own products
are designed using and for use with current personal computer technology and are
designed using and for use with current personal computer technology and are
designed to be Year 2000 compliant.  With respect to third-party providers whose
services are critical to the Company, the Company intends to monitor the efforts
of such providers as they become Year 2000 compliant.  Management is presently
not aware of any Year 2000 issues that have been encountered by any such third-
party which could materially affect the Company's operations.  Notwithstanding
the foregoing, there can be no assurance that the Company will not experience
operational difficulties as a result of Year 2000 issues, either arising out of
internal operations, or caused by third-party service providers, which
individually or collectively could have an adverse impact on business operations
or require the Company to incur unanticipated expenses to remedy any problems.


Item 2.    Description of Property

The following chart summarizes the Company's properties currently under lease for its operations:

<TABLE>
<CAPTION>

| Location | Approximate Size | Annual Rents | Expiration Date |
|----------|------------------|--------------|-----------------|
| <S> | <C> | <C> | <C> |
| Bothell, WA | 20,000 square ft. | $366,000 | Feb. 2004 |
| San Francisco, CA | 350 square ft. | $ 28,200 | month-to-month |

</TABLE>

The Bothell property is subleased from Pacific Aerospace & Electronics, Inc., a shareholder of the Company (PA&E) at market rates and on terms that are considered by the Company to be arm's length.

Item 3.   Legal Proceedings

The Company is not a party to any material legal proceedings.

Page 11 of 57

<PAGE>

Item 4.   Submission of Matters to a Vote of Security Holders

No matter was submitted to a vote of security holders during the fourth quarter of the fiscal year covered by this report.

Page 12 of 57

<PAGE>

PART II

Item 5.   Market for the Registrant's Common Stock and Related Shareholder Matters.

The Company's Common Stock is traded on the over-the-counter (Nasdaq Electronic Bulletin Board) market under the symbol "ORCA." In April 1997, the Company approved and implemented a 4 for 1 reverse split of its common stock, reducing the number of issued and outstanding shares of its common stock from 14,460,745 to 3,615,186 shares. The prices indicated in the following chart reflect this reverse split.

The following table shows the range of high and low bids for the Common Stock as reported by Nasdaq for each period in the fiscal years shown below.

<TABLE>
<CAPTION>

| Period (Fiscal Year Ended June 30,) | High | Low |
|-------------------------------------|------|-----|
| <S> | <C> | <C> |
| 1996 | | |
| Third Quarter (from February 13, 1996) | No Quotes Entered | |
| Fourth Quarter | No Quotes Entered | |

1997

| | | |
|---|---|---|
| First Quarter | $1.8125 | $0.625 |
| Second Quarter | $1.250 | $0.750 |
| Third Quarter | $1.750 | $0.750 |
| Fourth Quarter | $6.875 | $1.625 |

1998

| | | |
|---|---|---|
| First Quarter | $5.625 | $3.750 |
| Second Quarter | $2.750 | $1.000 |
| Third Quarter | $3.000 | $1.000 |
| Fourth Quarter | $2.625 | $1.750 |

</TABLE>

These quotations reflect inter-dealer prices, without retail mark-up, mark-down or commission, and may not represent actual transactions. As of September 30, 1998, there were approximately 500 holders of record of 12,778,407 shares of Common Stock issued and outstanding.

The Company has never declared or paid cash dividends on the Common Stock. The Company currently anticipates that it will retain all future earnings to fund the operation of its business and does not anticipate paying dividends on the Common Stock in the foreseeable future.

Recent Sales of Unregistered Securities

In November 1997, the Company issued 992,000 restricted shares of common stock in a private placement to certain accredited investors and sophisticated purchasers. In connection with the offering, the Company also issued warrants to purchase a total of 496,000 additional shares of common stock at $1.85 per share, which expired September 30, 1998. The net proceeds to the Company were approximately $1.4 million (or approximately $1.41 per share). The offer and sale of such shares was made without registration under the Securities Act of 1933, as amended (the "Act"), pursuant to and in reliance upon exemptions from the registration requirements of the Act, including the provisions of Sections 3(b) and 4(2) of the Act and the rules and regulations of the Securities and Exchange Commission promulgated thereunder.

In February 1998, the Company acquired Monitrx and DNA for cash and stock valued at approximately $4,150,000 and $265,000, respectively. The Company exchanged 1,311,000 shares of its restricted common stock valued at $1,206,120 ($.92 per share) and assumed approximately $3,207,000 in

Page 13 of 57

<PAGE>

liabilities in connection with these acquisitions. The Company also granted certain piggyback registration rights on a total of 1,200,000 shares in the event of a subsequent public offering of the Company's common stock.

In March 1998, the Company also issued 3,925,000 restricted shares of common stock in a private transaction to certain accredited investors and sophisticated purchasers. In connection with this offering, the Company also issued warrants to purchase a total of 1,570,000 restricted shares of common stock at $1.85 per share, expiring March 13, 1999. In connection with this offering, the Company also issued warrants to purchase 232,850 shares of common stock at $1.85 per share, as commissions. These warrants also expire on March 13, 1999. The net proceeds of the offering provided the Company with

approximately $4.4 million.

    In August, 1998, the Company issued 722,000 shares of restricted common stock at a price of $1.50 per share in a private transaction to certain accredited investors, which were also shareholders of the Company. Total proceeds to the Company from the sale of these shares was $1,083,000. The Company continues to offer its shares to other potential purchasers at the same price and terms.

    In each of the transactions described above, the offer and sale of such shares was made without registration in reliance upon exemptions from the registration requirements of the Securities Act of 1933, as amended (the "1933 Act") and relevant state law, applicable to private offerings.  The purchasers of the shares were accredited investors (as that term is defined in Rule 501 of Regulation D, promulgated under the 1933 Act) or sophisticated purchasers who had access to information reasonably intended to allow them to make an informed decision regarding a purchase of the shares.

    In fiscal year 1997, the Company issued 1,125,000 shares of Common Stock to consultants who were shareholders of the Company prior to its merger with and into Televar and who provided financial and other services to that entity.

Item 6.  Management's Discussion and Analysis or Plan of Operation

Formation of Company and Overview

    On August 30, 1996, the Company effected a merger between a wholly owned subsidiary formed for the purpose of the merger, and Televar, Inc.  (the "Merger").  The shareholders of Televar received 11,593,325 shares of  common stock of the Company in the Merger, resulting in shareholders of Televar owning an aggregate of about 83% of the 13,968,625 shares of common stock outstanding on the effective date of the Merger.  As a result of the Merger, Televar became a wholly owned subsidiary of the Company.  The Televar capital stock that was converted into the Company's common stock was converted based on a five-for-one conversion ratio.  In connection with the Merger, the Company also issued an aggregate of 1,125,000 shares of common stock to certain consultants as compensation for services rendered to the Company prior to the Merger.  The Company and Televar accounted for the merger as a reverse acquisition, or merger, with the surviving entity being the Company.  Prior to the Merger, the Company was inactive and had only nominal assets and liabilities.

    On April 12, 1997, the Company effected a one-for-four reverse split of its outstanding common shares.  Before the split, the Company had 14,640,745 shares outstanding.   After giving effect to the reverse split, the Company had 3,660,186 common shares outstanding.

    In anticipation of a proposed acquisition of the Company by Pacific Aerospace and Electronics, Inc. ("PA&E"), the Company and PA&E entered into an Operations Consulting and Expense Reimbursement Agreement (the "Interim Agreement") in June 1997.  Under the agreement, PA&E agreed to provide certain

                         Page 14 of 57
<PAGE>

consulting, management and financial assistance and support to the Company until PA&E's proposed acquisition of the Company, and several other entities could be completed.  PA&E subsequently determined that it would not proceed with the proposed acquisitions.

    During the term of the Interim Agreement, PA&E loaned a total of

approximately $4,219,418 to the Company.  In addition, on behalf of the Company, PA&E guaranteed a bank loan for approximately $1,215,765 and a three-year equipment lease of $373,421.

On April 27, 1998, the Company consummated an agreement with PA&E to convert the $4,219,418 owed into shares of Orca common stock at $2.00 per share (the "Restructuring Agreement").  In the Restructuring Agreement, Orca agreed to grant PA&E demand registration rights for those shares and, in the event of an underwritten public offering, piggy back registration rights, which will be effective the earliest of: (a) the closing of Orca's third round of financing, or (b) the first anniversary of the closing of the Restructuring Agreement.  In addition, PA&E agreed to continue guaranteeing Orca's $1,215,765 bank loan for eighteen months from the date of the agreement and to guarantee the equipment lease for the life of the lease.

As an inducement to obtain PA&E's agreement to convert the Company's debt to equity, the Company also agreed to purchase a promissory note and all related interests of PA&E in Brigadoon.com, Inc. ("Brigadoon").  This included PA&E's interest in a lawsuit filed by PA&E against Brigadoon to recover amounts Brigadoon owed PA&E, totaling approximately $1,600,000.  The Company also joined in filing involuntary bankruptcy proceedings against Brigadoon in March 1998.  Included in the rights acquired by the Company is a common stock purchase warrant that entitles the Company to purchase 12.5% of Brigadoon's common stock on a fully diluted basis.  The purchase price of these rights and interests was $950,000 payable over five years under a promissory note, with interest at the rate of 8% per annum.  Under the note, Orca will pay interest only for the first year commencing March 1, 1998 and will make fully amortizing monthly payments of principal plus interest for the final four years of the note term.  There is no assurance that the Company's interest in Brigadoon will ultimately have significant value for the Company.

In February 1998, the Company acquired all of the assets and certain liabilities of Monitrx.  Monitrx develops and markets advanced proprietary and patented network software applications for the home health care industry.  In addition, in February 1998, the Company acquired all the assets and certain liabilities of DNA.  DNA has developed a proprietary computer networking technology that empowers authorized field-based health care personnel without computer skills, to access and update data on network databases, by means of a regular touch-tone telephone pad.  Each of these acquisitions is more fully described in Part I, Item 1., Business - The 1998 Acquisitions, and in the "Business Acquisitions" footnote to the accompanying consolidated financial statements.

In September 1998, the Company sold substantially all of the assets and business of its Internet Service Operations.  In addition, the Company rescinded its agreement to purchase Boss Internet Group ("Boss"), an Internet Service Provider located in Washington.  Under the terms of the divestiture of the Company's Internet Services Group, the Company sold all of its rights and claims to Brigadoon, described above.  The Company remains liable under the $950,000 note payable to PA&E and the $1,215,765 note payable to a bank that has been guaranteed by PA&E.

Going forward, the Company intends to provide software application solutions to the home health care industry.

During the past year the Company has restructured itself to enter the market for these products.  This includes the following:

    .  Assimilation of a complete new management team;

\<PAGE\>

. Acquisition of two key strategic entities (Monitrx and DNA), which help
  to form the backbone of the Company's vision for the future.

. Completion of two significant private equity fundings
  providing net proceeds of approximately $5,750,000;

. Execution of a debt for equity swap to eliminate approximately
  $3,300,000 in debt; and

. Introduction of the Company's primary product line, CuraSys(TM), to
  the health care industry.

Results of Operations

   The Company has changed significantly in 1998.  The Company began the year
with one subsidiary (Televar) that was an Internet service provider.  In
February 1998, the Company acquired Monitrx and DNA.  Monitrx develops and
markets advanced proprietary and patented network based software applications
for the home health care industry.  DNA has developed a proprietary computer
networking technology that empowers authorized field-based health care personnel
without computer skills, to access and update data on network databases, using a
common touch-tone telephone pad.

   In June 1998, the Company agreed to acquire Boss Internet Group, an
Internet service provider.  However, in September 1998, the Company sold
substantially all of the assets and liabilities of Teller and rescinded its
previous acquisition of Boss.  Accordingly, the operating results of Televar and
Boss including provisions for estimated losses to the date of divestiture and
estimated costs of disposing of the operations have been segregated from
continuing operations and reported as a separate item on the Company's statement
of operations.

   Additionally, the loss from continuing operations for the year ended June
30, 1998 includes the operating results of Orca's corporate office for twelve
months and the operating results of Monitrx and DNA for five months (since the
date of acquisition).  The loss from discontinued operations for the year ended
June 30, 1997 does not include the operating results of Monitrx or DNA because
they were not part of the Company's operations in 1997.

   The Company had no revenues attributable to its continuing operations for
the years ended June 30, 1998 and 1997.  Therefore, there was no cost of
revenues for those periods.  Operating expenses from continuing operations for
the year ended June 30, 1998 were approximately $3,493,000 compared to $154,000
for the year ended June 30, 1997.  This increase is due to inclusion of the
operating expenses of subsidiaries acquired in 1998, which are not included in
1997 operating expenses.

   Research and development expenses were approximately $642,000.  These
expenses consisted primarily of personnel and allocated overhead and were
incurred in conjunction with research and further development of the CuraSys
software.  Sales and marketing expenses were approximately $474,000.  These
expenses consisted primarily of personnel, travel, marketing, advertising
expenses, and allocated overhead.  These expenses represent the cost of efforts
associated with the sales and marketing of the CuraSys product.  Professional
services expenses were approximately $476,000.  These expenses included
personnel, training and allocated overhead.  These expenses were incurred to
provide professional technical support for existing contracts and training in

anticipation of future growth.  Customer service expenses were approximately
$196,000.  These expenses consisted primarily of personnel, training and
associated overhead.  These expenses were incurred to provide customer service
for existing contracts and develop the department to accommodate projected
growth.  General and administrative expenses were approximately $1,705,000 for
the year ended June 30, 1998 compared to $154,000 for the year ended June 30,
1997.  General and administrative expenses consisted primarily of personnel and
administrative costs.  In addition, general and administrative expenses for the
year ended June 30, 1998, included charges of approximately $400,000 to reserve
for advances made to

Page 16 of 57

<PAGE>

related parties and employees due to the uncertainty of collection. General and
administrative expenses for the year ended June 30, 1997, were comparatively
lower because they do not include expenses of the acquired subsidiaries which
were not part of the Company's operations in 1997. Additionally, there was a
significantly lower level of corporate activity in 1997.

Going Concern Matters

     The accompanying financial statements have been prepared on the assumption
that the Company will continue as a going concern, which contemplates the
realization of assets and the satisfaction of liabilities in the normal course
of business.  The Company's independent public accountants have issued their
report for the year ended June 30, 1998 that includes an explanatory paragraph
stating that the Company's recurring losses and accumulated deficit, among other
things, raise substantial doubt about the Company's ability to continue as a
going concern.  As shown in the financial statements, during the years ended
June 30, 1998 and 1997, the Company incurred losses of approximately $7,333,738
and $2,787,328, respectively.  In addition, the Company has a net working
capital deficit of about $2,409,476, a cash balance of $472,754 and total
shareholders' equity of $1,568,506 as of June 30, 1998.  These factors, among
others, may indicate that the Company may not be unable to continue as a going
concern for a reasonable period of time.

     Financing for the Company's operations to date has been significantly
augmented by the sale of common stock and borrowings.  The Company's ability to
achieve a level of profitable operations or obtain additional financing to fund
its operations may impact the Company's ability to continue as it is presently
organized.  Resolution of these issues is dependent on the success of
management's plans to raise funds through the sale of its equity securities in a
private placement or a public offering and on the success of its new products.

     The financial statements do not include any adjustments relating to the
recoverability and classification of assets and liabilities that might be
necessary should the Company be unable to continue as a going concern.  The
Company's continuation as a going concern is dependent upon its ability to
generate sufficient cash flow to meet its obligations on a timely basis, to
obtain additional equity financing or borrowings, and ultimately to attain
profitability.

Business Acquisitions

     In February 1998, the Company acquired all of the assets and certain
liabilities of Monitrx.  The aggregate purchase price of $1,129,000 consisted of
1,200,000 shares of the Company's restricted common stock valued at
approximately $1,104,000 and certain expenses totaling $25,000.  In addition the
Company assumed about $3,044,286 in liabilities.  Costs in excess of net book

pesca

value of $3,700,000 were recorded as a result of this transaction.  Monitrx develops and markets advanced proprietary and patented network based software applications for the home health care industry.

In connection with the Monitrx acquisition, the purchase agreement requires the company to make cash payments to the former shareholders and employees of Monitrx on a declining scale over a five-year period commencing July 1, 1998, if annual net operating profits, as defined, exceed at least $1,200,000.

Also in February 1998, the Company acquired all of the assets and certain liabilities of DNA.  The aggregate purchase price of $107,000, which consisted of 111,000 shares of the Company's restricted common stock valued at $102,120 and certain expenses totaling $5,000.  In addition, the Company assumed about $162,736 in liabilities.  Costs in excess of the net book value of $240,000 were recorded as a result of this transaction.  DNA has developed a proprietary computer networking technology that empowers authorized field-based health care personnel without computer skills to access and update data on network databases, by means of a regular touch-tone telephone pad.

Page 17 of 57

<PAGE>

In June 1998, the Company agreed to purchase the stock of Boss.  The aggregate purchase price of $731,000 consisted of 777,776 shares of the Company's restricted common stock, warrants to purchase 300,000 shares of common stock exercisable over the next 18 months, and payment of certain expenses totaling $15,000.  Costs in excess of the net book value of $484,000 were recorded as a result of this transaction.  The transaction was rescinded in September 1998.  See "Discontinued Operations," below.

The business acquisitions described above have been accounted for using the purchase method, and accordingly, the operating results of the acquired entities have been included in the Company's consolidated financial statements from the date of acquisition.  The assets acquired and liabilities assumed have been recorded at an estimate of their fair values, with the difference being reflected as cost in excess of book value, or goodwill.  The related goodwill is amortized into operations over periods ranging from three to five years.

The following summary, prepared on a pro forma basis, combines the consolidated condensed results of operations as if Monitrx and DNA had been acquired as of the beginning of the year ended June 30, 1997.  There are no material adjustments that impact the summary.

<TABLE>
<CAPTION>

|  | 1998 | 1997 |
|---|---|---|
| <S> | <C> | <C> |
| Revenues | $        — | $        — |
| Loss from continuing operations | $(4,761,000) | $(1,630,000) |
| Net loss from continuing operations | $(4,777,000) | $(1,717,000) |
| Basic Loss per Share from Continuing Operations | $   (0.65) | $   (0.39) |
| Weighted Average number of shares outstanding | 7,385,698 | 4,432,819 |

</TABLE>

The pro forma results are not necessarily indicative of the actual results of operations that would have occurred had the transactions been consummated as indicated, nor are they intended to indicate results that may occur in the future.

Discontinued Operations

In June 1998, the Company's Board of Directors adopted a plan to discontinue its Internet Service Operations Group.  On September 28, 1998 the Company completed a transaction whereby it sold substantially all of the assets and most of the liabilities of these operations to the Boss Internet Group.  In addition, Boss and the Company, in a separate agreement, dated September 10, 1998, agreed to rescind the Company's agreement to acquire Boss Internet Group.

Accordingly, the operating results of the Internet Service Group, including provisions for estimated losses to the date of disposal and estimated costs of disposing of the operations have been segregated from continuing operations and reported as a separate item on the statement of operations as discontinued operations.

The Company has restated its prior financial statements to present the operating results of the Internet Service Group as discontinued operations.  The components of net assets of the discontinued operations included in the accompanying consolidated balance sheets are as follows:

Page 18 of 57

<PAGE>

<TABLE>
<CAPTION>

|  | 1998 | 1997 |
|---|---|---|
| <S> | <C> | <C> |
| Receivables - net | $   212,227 | $   373,216 |
| Prepaid expenses | $    70,553 | $    70,556 |
| Property and equipment - net | $1,542,112 | $   826,413 |
| Other assets | 642,366 | 227,249 |
| Accounts payable | (751,168) | (1,414,317) |
| Accrued liabilities | (188,107) | (826,676) |
| Deferred revenues | (385,625) | (144,009) |
| Long-term debt | (602,323) | (2,153,648) |
|  | $   540,035 | $(3,041,216) |

</TABLE>

Liabilities of the Internet Services Group to be retained by the Company as of June 30, 1998, and included in the amounts listed above, are $201,168 included in accounts payable, $15,326 included in accrued liabilities, $327,354 included in deferred revenues and $130,312 included in long-term debt.

Under generally accepted accounting principles, a provision for loss on discontinued operations has been included based upon management's best estimates of the amounts expected to be realized on the sale.

Liquidity and Capital Resources

At June 30, 1998, the Company's total current assets were $809,855 and its total current liabilities were $3,600,729 for net negative working capital of $2,790,874.

The Company has met some of its cash requirements through a combination of cash flow from its discontinued operations, issuance of Common Stock, borrowings from PA&E and other sources and the conversion of certain related party debt

into equity.

The Company continues to carry a significant amount of debt, for which there is no current source of repayment.

The proceeds from borrowings, together with cash from operations are insufficient to fund budgeted operations for the near term.  The Company will require additional financing in order to fund its operating plan and operations and is in discussions with several potential sources of equity or debt financing.  There is no assurance however, that these discussions will result in additional funding on terms that are favorable to the Company or that additional financing will be available to the Company from other sources.  If the Company is unable to raise additional capital, the Company's ability to continue operations may be adversely affected.

During the year the Company issued 4,917,000 restricted shares of common stock to certain accredited investors in two private transactions exempt from registration under federal and state securities laws.  In connection with these offerings the Company also issued warrants to purchase 2,298,850 shares of common stock at $1.85 per share, expiring in various amounts on September 30, 1998 and March 13, 1999.  The net proceeds to the Company from these two offerings was approximately.

As of June 30, 1998 the Company had outstanding common stock purchase warrants as follows (no warrants were exercised, canceled or expired during the year):

Page 19 of 57

<PAGE>

<TABLE>
<CAPTION>

| Expiry Date | Exercise Price | No. of Warrants | Cash Available from Exercise |
| --- | --- | --- | --- |
| <S> | <C> | <C> | <C> |
| September 1998 | $1.85 | 496,000 | $  917,600 |
| December 1998 | 2.04 | 100,000 | 204,000 |
| March 1999 | 1.85 | 1,802,850 | 3,335,273 |
| June 1999 | 2.04 | 100,000 | 204,000 |
| December 1999 | 2.04 | 100,000 | 204,000 |
| September 2001 | 1.81 | 65,000 | 117,650 |
| | | 2,663,850 | $4,982,523 |

</TABLE>

The holders of warrants, each acting on their own will most likely consider a number of factors before exercising.  Among those factors that could be considered will be the current market value of the Company's common stock on or around the exercise date and the prospects for the Company going forward.  There can be no assurances that warrant holders will exercise their rights and purchase additional shares from the Company.  Holders of warrants expiring in September 1998 did not elect to exercise their rights to purchase additional common stock shares and there can be no assurances that other outstanding warrants will be exercised.

Income Taxes

The Company has available net operating loss (NOL) carry forwards of approximately $10,728,000, the benefits of which will expire in various amounts through 2013.  NOLs will only be usable to the extent that the Company is successful in obtaining future profitability, or incurring profitable transactions.

Risks and Uncertainties

   With the sale of its Internet Service Group, the Company has focused its operations on its ability to develop and effectively bring to market high technology software products to meet its customers' needs in the home health care industry.  In the competitive market environment in which the Company intends to operate, software development and marketing processes are uncertain and complex, requiring successful management of various development and marketing risks.  The Company's ability to continue to attract the appropriate number and quality of software development and senior management personnel and to successfully introduce its products to the market place, could impact its ability to capture market share.

   The Company's products have been developed with full recognition of the pending new millennium, however acceptance of the Company's products may be impacted by adverse Year 2000 problems by potential customers.

   Additionally, the health care industry in general, as well as the home health care segment, is undergoing significant and rapid changes.

   In light of these factors, it is reasonably possible that failure to successfully manage software development, failure to successfully introduce products to market, uncontrollable failures of internal computer systems at potential customer sites, or the Company's failure to adopt to a rapidly changing business environment could have severe near-term impacts on the Company's prospects for growth.

                              Page 20 of 57

<PAGE>

Year 2000 Issues

   The Company uses computer hardware and software to manage its business and operations and to aid in the design and manufacture of its products.  The Company also relies on third-parties to facilitate its business including, for example: telecommunications providers; public utilities which provide electrical power and other utilities needed in the Company's operations; major credit card companies that process payments for the Company's products; major shipping companies through which the Company ships its products; financial institutions that provide commercial banking and other financial services to the Company; and the over-the-counter stock market, which reports information regarding the Company's stock.

   Many existing computer programs use only two digits to identify a year in the date field and were designed, developed and modified without considering the impact of the upcoming change in the century. If not corrected, such computer applications could fail or create erroneous results by or after the Year 2000 by erroneously identifying the year "00" as 1900, rather than 2000. Correcting a Year 2000 problem on a large mainframe or network application can be difficult and expensive.  If a company does not successfully address its Year 2000 issues, it may face material adverse consequences.  The Company is in the process of insuring that all of its internal computer systems are Year 2000 compliant.  In addition, the Company has designed its own products to be Year 2000 compliant.

The Company has selected a team of employees to assess the readiness of the Company for meeting the Year 2000 problem. As a result of the assessment efforts of this team to date, the Company has identified one product component requiring modification and has engaged the services of a consultant to make the necessary modification to make this product Year 2000 compliant. It is expected that the assessment and remediation, if any, of Year 2000 issues affecting the Company's internal systems or products, including any issues involving embedded technology, will be completed by June 30, 1999.

With respect to third-party providers whose services are critical to the Company, the Company intends to monitor the efforts of such providers as they become Year 2000 compliant. The Company is presently not aware of any Year 2000 issues that have been encountered by any such third party which could materially affect the Company's operations. Notwithstanding the foregoing, there can be no assurance that the Company will not experience operational difficulties as a result of Year 2000 issues, either arising out of internal operations or caused by third-party service providers, which individually or collectively could have a material adverse effect on the Company's business, financial condition or results of operations.

Recent Accounting Pronouncements

In September 1997, the Financial Accounting Standards Board ("FASB") issued SFAS No. 130, "Reporting Comprehensive Income" (SFAS 130). SFAS 130 requires entities presenting a complete set of financial statements to include details of comprehensive income that arise in the reporting period. Comprehensive income consists of net earnings or loss for the current period and other comprehensive income, which consists of revenue, expenses, gains and losses that bypass the statement of earnings and are reported directly in a separate component of equity. Other comprehensive income includes, for example, foreign currency items, minimum pension liability adjustments and unrealized gains and losses on certain investment securities.

SFAS 130 requires that components of comprehensive income be reported in a financial statement that is displayed with the same prominence as other financial statements. SFAS is effective for fiscal years beginning after December 15, 1997 and requires restatement of prior period financial statements presented for comparative purposes. Adoption of SFAS 130 is not required for reporting on interim periods prior to the close of the fiscal year beginning after December 15, 1997. The Company will adopt SFAS 130 commencing with the year ending June 30, 1999 and does not anticipate it will have a significant impact on the Company.

Page 21 of 57

<PAGE>

During January 1998, the American Institute of Certified Public Accountants ("AICPA") issued Statement of Position 98-5 "Reporting on the Costs of Start-up Activities" ("SOP 98-5"). SOP 98-5 becomes effective for all fiscal years beginning after December 15, 1998. The Company will adopt SOP 98-5 in its fiscal year beginning July 1, 1999. Because the current amortization periods of the product development costs and start-up costs averaging 12 months, the Company does not expect the adoption of SOP 98-5 to have a material impact on the Company's financial statements.

During January 1998, the AICPA issued Statement of Position 98-1 "Accounting for the Costs of Computer Software Developed or Obtained for Internal Use" ("SOP 98-1"). SOP 98-1 becomes effective for all fiscal years beginning after December 15, 1998. The Company does not expect the adoption of

SOP 98-1 to have a material adverse effect on the Company's financial statements.

Subsequent Events

On August 20, 1998 the Company received approximately $840,000 in partial net proceeds from a private equity offering.  The Company anticipates receiving additional funds under this offering.  In the event that the offering is fully subscribed it is anticipated that the net proceeds to the Company would be approximately $1,400,000.

The Company is continuing discussions to secure additional financing. Notwithstanding the receipt of funds in connection with the above mentioned August financing, the Company requires additional funds to continue operations. There can be no assurance that the Company will be successful in its efforts to attract additional financing.

On September 28, 1998 the Company completed a transaction whereby it sold substantially all of the assets and most of the liabilities of its wholly owned subsidiary, Televar to Boss.  The transaction is more fully described in the "Discontinued Operations" note to the financial statements.

Page 22 of 57

<PAGE>

Item 7.  Financial Statements

The consolidated financial statements of the Company follow and are a part of this report.

Index to Financial Statements
------------------------------

<TABLE>
<CAPTION>

|  | Page |
|---|---|
| <S> | <C> |
| Independent Auditor's Report | |
| Balance Sheet, June 30, 1998 | |
| Statements of Operations for the Years Ended<br> June 30, 1997 and June 30, 1998 | |
| Statements of Stockholders' Deficit for the Years Ended<br> June 30, 1997 and June 30, 1998 | |
| Statements of Cash Flows for the Years Ended June 30, 1997<br> and June 30, 1998 | |
| Notes to Financial Statements | |

</TABLE>

Page 23 of 57

<PAGE>

REPORT OF INDEPENDENT PUBLIC ACCOUNTANTS

TO THE SHAREHOLDERS AND DIRECTORS OF ORCA TECHNOLOGIES, INC.:

We have audited the accompanying consolidated balance sheets of Orca Technologies, Inc. (a Utah corporation) and subsidiaries as of June 30, 1998 and 1997, and the related consolidated statements of operations, shareholders' (deficit) equity and cash flows for the years then ended.  These financial

statements are the responsibility of the Company's management.  Our
responsibility is to express an opinion on these financial statements based upon
our audits.

We conducted our audits in accordance with generally accepted auditing
standards.  Those standards require that we plan and perform the audit to obtain
reasonable assurance about whether the financial statements are free of material
misstatement.  An audit includes examining, on a test basis, evidence supporting
the amounts and disclosures in the financial statements.  An audit also includes
assessing the accounting principles used and significant estimates made by
management, as well as evaluating the overall financial statement presentation.
We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in
all material respects, the consolidated financial position of Orca Technologies,
Inc. as of June 30, 1998 and 1997, and the consolidated results of its
operations and its cash flows for the years then ended, in conformity with
generally accepted accounting principles.

The accompanying financial statements have been prepared assuming that Orca
Technologies, Inc., and its subsidiaries, will continue as going concerns.  As
discussed in the footnotes to the financial statements, the Company has
accumulated losses and a net working capital deficit as of June 30, 1998, which
raise substantial doubt about the ability of the Company to continue as a going
concern.  Management's plans in regard to these matters are also described in
the footnotes.  The financial statements do not include any adjustments that
might result from the outcome of this uncertainty.


Mantyla, McReynolds and Associates
Salt Lake City, Utah
August 21, 1998,
Except for Note 19, as to which the date is October 8, 1998

<PAGE>

ORCA Technologies, Inc.

CONSOLIDATED BALANCE SHEETS

As of June 30

<TABLE>
<CAPTION>


<S>                                                            <C>
ASSETS
- ------
    CURRENT ASSETS
        Cash and cash equivalents                               $
        Receivables
        Inventories
        Prepaid expenses and other
                                                               ----------

        Total Current Assets
                                                               ----------

    LONG-TERM RECEIVABLES
    PROPERTY AND EQUIPMENT, net
    OTHER ASSETS

```
                                                                        ----------

                                                                        $
                                                                        ==========


LIABILITIES AND SHAREHOLDERS' EQUITY (DEFICIT)
- ----------------------------------------------
    CURRENT LIABILITIES
        Current portion of long-term debt                               $
        Accounts payable
        Accrued liabilities
        Accrued loss for discontinued operations
        Deferred revenues
                                                                        ----------

            Total Current Liabilities
                                                                        ----------


    LONG-TERM DEBT
    COMMITMENTS AND CONTINGENCIES
    SHAREHOLDERS' EQUITY (DEFICIT)
                                                                        ----------

                                                                        $
                                                                        ==========


</TABLE>

  The accompanying notes are an integral part of these consolidated statements.

                            Page 25 of 57
<PAGE>
                          ORCA Technologies, Inc.
                    CONSOLIDATED STATEMENTS OF OPERATIONS
                        For the Years Ended June 30
<TABLE>
<CAPTION>
                                                                        1
                                                                        -
<S>                                                                     <C>
Revenue                                                                 $

Costs and Expenses:
    Cost of revenue
    Research and development
    Sales and marketing
    Professional services
    Customer services
    General and administrative
        Total operating costs and expenses

Operating Loss                                                          (

Interest Income
Interest Expense

Loss from Continuing Operations                                         (

Discontinued Operations:
    Loss from discontinued operations                                   (
    Loss on disposal                                                    (
```

```
Net Loss                                                          $        (

Basic Loss per Share:
   Loss from Continuing Operations                               $
   Loss from Discontinued Operations
                                                                 ==========
Net Loss per Share                                               $
                                                                 ==========
```

</TABLE>
The accompanying notes are an integral part of these consolidated statements.

<PAGE>

ORCA Technologies, Inc.

CONSOLIDATED STATEMENTS OF SHAREHOLDERS' (DEFICIT) EQUITY

For the Years Ended June 30

<TABLE>
<CAPTION>

|  |  | Common Stock | | Additional Paid-in Capital |
| --- | --- | --- | --- | --- |
| <S> |  | <C> |  | <C> |
| BALANCE,  JUNE 30, 1996 | $ | 1,697 | $ | 306,056 |
| Net Loss |  |  |  |  |
| Merger of Televar, Inc. and ORCA |  | 11,818 |  | (11,818 |
| Shares issued for services in connection |  |  |  |  |
|    with  the Televar / ORCA merger |  | 1,125 |  | (1,125 |
| Reverse stock split (one-for-four) |  | (10,980) |  | 10,980 |
| Stock issued in satisfaction of a debt |  | 45 |  | 44,955 |
| BALANCE,  JUNE 30, 1997 |  | 3,705 |  | 349,048 |
| Net Loss |  |  |  |  |
| Stock issued in satisfaction of a debt |  | 14 |  | 52,486 |
| Sale of common stock |  | 4,917 |  | 5,744,952 |
| Acquisition of businesses |  | 2,088 |  | 1,919,585 |
| Conversion of debt to equity |  | 2,110 |  | 4,217,308 |
| BALANCE, JUNE 30, 1998 | $ | 12,834 | $ | 12,283,379 |

</TABLE>
The accompanying notes are an integral part of these consolidated statements.

<PAGE>

ORCA Technologies, Inc.

CONSOLIDATED STATEMENTS OF CASH FLOWS

For the Years Ended June 30

<TABLE>
<CAPTION>

OPERATING ACTIVITIES

| `<S>` | `<C>` |
|---|---|
| Net Loss | $ |
| Adjustments to reconcile net loss to net cash | |
| from operating activities: | |
| Depreciation and amortization | |
| Loss on disposal of subsidiary | |
| Write-off of long-term notes receivable | |
| Change in operating assets and liabilities, | |
| net of effect of businesses acquired: | |
| Accounts receivable | |
| Inventories | |
| Accounts payable | |
| Other current assets | |
| Other current liabilities | |
| | --- |
| Net Cash Used By Operating Activities | |
| | --- |
| | |
| INVESTING ACTIVITIES | |
| Advances under long-term receivables | |
| Advances to related parties under long-term receivables | |
| Cash collections from long-term receivables | |
| Capital expenditures for property and equipment | |
| Pre-acquisition advances to acquired subsidiaries | |
| Change in other assets - net | |
| | --- |
| Net Cash Used By Investing Activities | |
| | --- |
| | |
| FINANCING ACTIVITIES | |
| Payments on long-term debt | |
| Borrowings on long-term debt | |
| Borrowing from related parties on long-term debt | |
| Proceeds from sale of common stock | |
| | --- |
| Net Cash Provided By Financing Activities | |
| | --- |
| | |
| Net Cash Provided (Used) | |
| | |
| Cash and cash equivalents, beginning of year | |
| | --- |
| Cash and Cash Equivalents, End of Year | $ |
| | === |

</TABLE>
 The accompanying notes are an integral part of these consolidated statements.

<PAGE>

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS


NOTE 1:    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

        BASIS OF PRESENTATION.  Orca Technologies, Inc., located in Bothell,
        Washington provides sophisticated network-based software solutions for the

increasing information needs of the home healthcare industry.  The
Company's software products are designed to fully integrate both the front
and back office management needs of a home health care agency.

In December 1997 the Company changed its name from "Jungle Street, Inc." to
Orca Technologies, Inc.  At the time of the name change, the Company's
trading symbol on the electronic bulletin board was changed from "JNGS" to
"ORCA".

In June of 1998 the Company formally decided to dispose its Internet
Service Operations segment.  Prior to that date the Company was engaged in
the Internet Service Business.  The accounts and activities of the
Company's wholly-owned subsidiaries, Televar, Inc. and Boss Internet, Inc.
have been presented in the accompanying financial statements as
"discontinued operations."

ACCOUNTING PRINCIPLES.  The financial statements are prepared on a basis
consistent with United States generally accepted accounting principles.

PRINCIPLES OF CONSOLIDATION.  The consolidated financial statements of Orca
Technologies, Inc. and Subsidiaries (the Company) include the accounts of
the Company and its Subsidiaries.  All significant intercompany
transactions have been eliminated.

USE OF ESTIMATES.  The preparation of financial statements in conformity
with generally accepted accounting principles requires management to make
estimates and assumptions that affect the amounts reported in its
consolidated financial statements and accompanying notes.  Actual results
may differ from these estimates.

REVENUE RECOGNITION.  Revenue will be recognized when earned, as products
are shipped or services provided to customers.

RESEARCH AND DEVELOPMENT.  Research and development costs are expensed as
incurred.  The cost of equipment used in research and development is
capitalized and not treated as expense of the period.  Such equipment is
depreciated over its estimated useful life.

FEDERAL INCOME TAX.  Deferred tax assets and liabilities will be recognized
for the expected tax consequences of temporary differences between the tax
bases of assets and liabilities and their reported amounts for financial
reporting purposes.

                          Page 29 of 57
<PAGE>

For the years ending June 30, 1998 and 1997 the Company had no significant
income tax expense or liability as a result of net operating losses
incurred.  Deferred tax benefits, and the related deferred tax assets,
arising from the recognition of the tax consequences of net operating
losses have not been recorded or recognized by the Company.  Currently,
there is no reasonable assurance that the Company will be able to take
advantage of accumulated loss carryforwards in future periods.

CALCULATION OF COMMON SHARE DATA.  Loss per share of common stock has been
computed on the basis of the weighted average number of shares of common
stock outstanding during the period.  Common stock equivalents have been
excluded from the calculation, as due to the loss they would be anti-
dilutive.  The weighted average number of outstanding shares were 6,569,048
and 3,121,819 for the years ending June 30, 1998 and 1997, respectively.

STOCK-BASED COMPENSATION. In accordance with the provisions of Financial Accounting Standards Board Opinion No. 123, "Accounting for Stock-Based Compensation" (FASB 123), the Company intends to follow the intrinsic value based method of accounting for stock-based compensation. The intrinsic value method is prescribed by Accounting Principles Board Opinion No. 25, "Accounting for Stock Issued to Employees" (APB 25).

Under APB 25, when the exercise price of employee stock options equals the market price of the underlying stock on the date of grant, no compensation expense is recorded. At the date of grant, the market price was equal to the grant price. Accordingly, no compensation cost has been recognized in the financial statements related to options. The Company has adopted the disclosure-only provisions of FASB 123.

CASH AND CASH EQUIVALENTS. The Company considers all highly liquid investments with maturities of three months or less when purchased to be cash equivalents. The Company places its cash and cash equivalents with high credit quality institutions. At times, such investments may be in excess of the Federal Deposit Insurance Corporation insurance limits.

INVENTORIES. Inventories are stated at the lower of cost (first-in, first-out method) or market. At June 30, 1998 they consist of finished goods purchased for resale.

PROPERTY AND EQUIPMENT. Property and equipment are recorded at cost and depreciated for financial reporting purposes using the straight-line method over the lesser of the related lease life, or estimated useful lives of the assets. Amounts recorded as depreciation expense include amortization expense for assets acquired under capitalized leases. Expenditures that extend the useful life of the related asset are capitalized, whereas maintenance and repairs are expensed as incurred.

Page 30 of 57

<PAGE>

DEFERRED REVENUES. The Company has historically collected fees for its Internet access service on monthly, quarterly, or annual billing arrangements. The Company records cash receipts as deferred revenues and recognizes revenue when the earnings process is complete.

GOODWILL. Represents costs in excess of the value of net assets of businesses acquired, and is amortized over periods ranging from three to five years using the straight-line method.

FAIR VALUE. The carrying value of financial instruments approximates fair value, unless otherwise disclosed. Fair values have been estimated using available market prices for similar issues and maturities.

RECLASSIFICATIONS. Certain prior year amounts have been reclassified to conform to fiscal 1998 presentation. These changes had no impact on previously reported results of operations or shareholders' equity.

NOTE 2:   FORMATION OF COMPANY

On August 30, 1996, the Company effected a merger between a wholly owned subsidiary formed for the purpose of the merger, and Televar, Inc. (the "Merger"). The shareholders of Televar received 11,593,325 shares of common stock of the Company in the Merger, resulting in shareholders of

Televar owning an aggregate of about 83% of the 13,968,625 shares of common stock outstanding on the effective date of the Merger. As a result of the Merger, Televar became a wholly owned subsidiary of the Company. The Televar capital stock that was converted into the Company's common stock was converted based on a five-for-one conversion ratio. In connection with the Merger, the Company also issued an aggregate of 1,125,000 shares of common stock to certain consultants as compensation for services rendered to the Company prior to the Merger. The Company and Televar accounted for the merger as a reverse acquisition, or merger, with the surviving entity being the Company.

Prior to the Merger, the Company was inactive and had only nominal assets and liabilities.

On April 12, 1997, the Company executed a one-for-four reverse stock split of its outstanding common shares. Before the split, the Company had 14,640,745 shares outstanding, while after effecting the reverse stock split, the Company had 3,660,186 shares outstanding.

In anticipation of a proposed acquisition of the Company by Pacific Aerospace and Electronics, Inc. ("PA&E"), the Company and PA&E entered into an Operations Consulting and Expense Reimbursement Agreement (the "Interim Agreement") in June 1997. Under the agreement, PA&E agreed to provide

<PAGE>

certain consulting, management and financial assistance and support to the Company until PA&E's proposed acquisition of the Company, and several other entities could be completed. PA&E subsequently determined that it would not proceed with the proposed acquisitions.

During the term of the Interim Agreement, PA&E loaned a total of approximately $4,219,418 to the Company. In addition, on behalf of the Company, PA&E guaranteed a bank loan for approximately $1,215,765 and a three-year equipment lease of $373,421.

On April 27, 1998, the Company consummated an agreement with PA&E to convert the $4,219,418 owed into shares of Orca common stock at $2.00 per share (the "Restructuring Agreement"). In the Restructuring Agreement, Orca agreed to grant PA&E demand registration rights for those shares and, in the event of an underwritten public offering, piggy back registration rights, which will be effective the earliest of : (a) the closing of Orca's third round of financing, or (b) the first anniversary of the closing of the Restructuring Agreement. In addition, PA&E agreed to continue guaranteeing Orca's $1,215,765 bank loan for eighteen months from the date of the agreement and to guarantee the equipment lease for the life of the lease.

As an inducement to obtain PA&E's agreement to convert the Company's debt to equity, the Company also agreed to purchase a promissory note and all related interests of PA&E in a company, Brigadoon.com, Inc. ("Brigadoon"). This included PA&E's interest in a lawsuit filed by PA&E against Brigadoon to recover amounts Brigadoon owed PA&E, totaling approximately $1,600,000. The Company also joined in filing involuntary bankruptcy proceedings against Brigadoon in March 1998. Included in the rights acquired by the Company is a common stock purchase warrant that entitles the Company to purchase 12.5% of Brigadoon's fully diluted common stock. The purchase price of these rights and interests was $950,000 payable over five years under a promissory note, with interest at the rate of 8% per annum. Under

the note, Orca will pay interest only for the first year commencing March
1, 1998 and will make fully amortizing monthly payments of principal plus
interest for the final four years of the note term.  There is no assurance
that the Company's interest in Brigadoon will ultimately have significant
value for the Company.

Under the terms of the contemplated disposal of the Company's Internet
Services Group, the Company intends to include all of its rights and claims
to Brigadoon assets in any sale of the discontinued operations.  The
Company will retain the $950,000 note payable to PA&E and the $1,215,765
PA&E guaranteed note payable to a bank.


NOTE 3:    GOING CONCERN MATTERS

                              Page 32 of 57
<PAGE>

     The accompanying financial statements have been prepared on a going concern
basis, which contemplates the realization of assets and the satisfaction of
liabilities in the normal course of business.  As shown in the financial
statements, during the years ended June 30, 1998 and 1997, the Company
incurred net losses of approximately $7,333,738 and $2,787,328,
respectively.  In addition, the Company has a net working capital deficit
of about $4,006,639, a cash balance of $472,754 and total shareholders'
equity of $1,568,506 as of June 30, 1998.  These factors, among others, may
indicate that the Company may not be unable to continue as a going concern
for a reasonable period of time.

     Financing for the Company's operations to date has been significantly
augmented by the sale of common stock and borrowings.  The Company's
ability to achieve a level of profitable operations and / or additional
financing may impact the Company's ability to continue as it is presently
organized.  Resolution of these issues is dependent on the success of
management's plans to raise funds through the sale of its equity securities
in a private placement or a public offering.

     The financial statements do not include any adjustments relating to the
recoverability and classification of assets and liabilities that might be
necessary should the Company be unable to continue as a going concern.  The
Company's continuation as a going concern is dependent upon its ability to
generate sufficient cash flow to meet its obligations on a timely basis, to
obtain additional equity financing or borrowings, and ultimately to attain
profitability.


NOTE 4:    RELATED PARTY TRANSACTIONS

     An officer and director of the Company and a director of the Company were,
until January 1998, directors of PA&E.  Both are also shareholders of PA&E.
In addition, PA&E's Chief Executive Officer and President (CEO), as well as
its Chief Financial Officer (CFO) and certain members of the CFO's family
are, or were, shareholders of the Company.  Until June 1997, PA&E's CEO and
CFO were directors of the Company.  A shareholder of the Company, who
currently owns about 2.6% of the Company's stock is a director and
shareholder of PA&E.  As of September 15, 1998, PA&E is the beneficial
owner of approximately 17.9% of the Company's outstanding common stock.

     The Company subleases from PA&E approximately 20,000 square feet of a newly
constructed office building situated in Bothell, Washington, which serves

Page 34 of 57

as the Company's corporate headquarters, and primary office facility.  The
Company believes that the terms and conditions of the lease, and sub-lease,
are at prevailing market rates and terms in the suburban Seattle area in
which the building is located.

Page 33 of 57

<PAGE>

Certain officers and / or directors and shareholders of both the Company
and PA&E have each personally guaranteed certain obligations of the Company
or its subsidiaries.

PA&E has agreed to guarantee certain of the Company's debt instruments,
including a loan from a Bank in the amount of $1,215,765 and equipment
under a capital lease with the sum of the original payments totaling
approximately $373,421.

In addition, the Company owes PA&E $950,000 under the terms of a loan
executed at the time of the Company's debt restructuring.  Under the terms
of the agreement, PA&E has the option to require that the entire unpaid
balance of principal and interest immediately become due and payable in the
event of default.  Although the Company is not current with its interest
payments, there has been no formal notification that PA&E will exercise the
default acceleration provisions of the agreement.  (See notes "Formation of
Company" and "Long-Term Debt".)

During the year the Company paid $55,000 in consulting fees to a company
whose president was simultaneously the President of Televar, Inc.  The
former Televar President resigned effective September 1997.  In a
subsequent complaint and cross-complaint, the former President and the
Company each alleged certain matters.  The matters were mediated in April
1998, with the Company paying the former President $125,000 to settle the
case.

ORCA presently holds a $250,000 note receivable from a company in which an
officer, director and shareholder of ORCA along with another director and
shareholder of ORCA, are also officers, directors and shareholders.  In
addition, as of June 30, 1998 ORCA has provided approximately $42,000 in
unreimbursed administrative services to the company.  These amounts have
been fully reserved in Company's financial statements.

As a result of the acquisition of MONITRx Corporation (Monitrx), the
Company assumed certain notes payable, totaling about $500,000, to former
shareholders of Monitrx, who are now officers or former officers of the
Company.  The notes require monthly payments of principal and interest over
the next three years.  In addition, the notes require the Company to pay 6%
of all new common stock equity raised as additional principal payments on
the notes, until such time as the notes are fully repaid.

The Company has made various advances, in the form of notes receivable, to
certain officers and other key employees in connection with the relocation
of former Monitrx employees to the Company's Bothell, Washington facility.
The notes total about $150,000, are non-interest bearing and are to be
repaid out of future earnings of the acquired operations.  As of June 30,
1998 the notes have been fully reserved.

Page 34 of 57

<PAGE>

NOTE 5:     BUSINESS ACQUISITIONS

In February 1998, the Company acquired all of the assets and certain
liabilities of Monitrx.  The aggregate purchase price of $1,129,000
consisted of 1,200,000 shares of the Company's restricted common stock
valued at approximately $1,104,000 and certain expenses totaling $25,000.
In addition the Company assumed about $3,044,286 in liabilities.  Costs in
excess of net book value of $3,700,000 were recorded as a result of this
transaction.  Monitrx develops and markets advanced proprietary and
patented network based software applications for the home health care
industry.

In connection with the Monitrx acquisition, the purchase agreement requires
the company to make cash payments to the former shareholders and / or
employees of Monitrx on a declining scale over a five-year period
commencing July 1, 1998, if annual net operating profits, as defined,
exceed at least $1,200,000.

Also in February 1998, the Company acquired all of the assets and certain
liabilities of Digital Network Associates, Inc. (DNA).  The aggregate
purchase price of $107,000, which consisted of 111,000 shares of the
Company's restricted common stock valued at $102,120 and certain expenses
totaling $5,000.  In addition, the Company assumed about $162,736 in
liabilities.  Costs in excess of the net book value of $240,000 were
recorded as a result of this transaction.  DNA has developed a proprietary
computer networking technology that empowers authorized field-based health
care personnel without computer skills, to access and update data on
network databases, by means of a regular touch-tone telephone pad.

In June 1998, the Company acquired the stock of Boss Internet Group (Boss).
The aggregate purchase price of $731,000 consisted of 777,776 shares of the
Company's restricted common stock, 300,000 warrants exercisable over the
next 18 months, and certain expenses totaling $15,000.  Costs in excess of
the net book value of $484,000 were recorded as a result of this
transaction.

The business acquisitions described above have been accounted for using the
purchase method, and accordingly, the operating results of the acquired
entities have been included in the Company's consolidated financial
statements from the date of acquisition.  The assets acquired and
liabilities assumed have been recorded at an estimate of their fair values,
with the difference being reflected as cost in excess of book value, or
goodwill.  The related goodwill is being amortized into operations over
periods ranging from three to five years.

The following summary, prepared on a pro forma basis, combines the
consolidated condensed results of operations as if Monitrx and DNA had been

<PAGE>

acquired as of the beginning of the year ended June 30, 1997.  There are no
material adjustments that impact the summary.

|  | 1998 | 1997 |
| --- | --- | --- |
| Revenues | $       - | $       - |
| Loss from continuing operations | $(4,761,000) | $(1,630,000) |

| | | |
|---|---|---|
| Net loss from continuing operations | $(4,777,000) | $(1,717,000) |
| Basic loss per share from continuing operations | $ (0.65) | $ (0.39) |
| Weighted average number of share outstanding | 7,385,698 | 4,432,819 |

The pro forma results are not necessarily indicative of the actual results of operations that would have occurred had the transactions been consummated as indicated, nor are they intended to indicate results that may occur in the future.

NOTE 6:   DISCONTINUED OPERATIONS

In June 1998, the Company's Board of Directors adopted a plan to discontinue its Internet Service Operations Group.  On September 28, 1998 the Company completed a transaction whereby it sold substantially all of the assets and most of the liabilities of these operations to the Boss Internet Group.  In addition, Boss and the Company, in a separate agreement, dated September 10, 1998, agreed to the rescission of the Company's previously announced acquisition of the Boss Internet Group.

Accordingly, the operating results of the Internet Service Group, including provisions for estimated losses to the date of disposal and estimated costs of disposing of the operations have been segregated from continuing operations and reported as a separate item on the statement of operations.

The Company has restated its prior financial statements to present the operating results of the Internet Service Group as discontinued operations. The components of net assets of the discontinued operations included in the accompanying consolidated balance sheets are as follows:

Page 36 of 57

<PAGE>

| | 1998 | 1997 |
|---|---|---|
| Receivables - net | $ 212,227 | $ 373,216 |
| Prepaid expenses | 70,553 | 70,556 |
| Property and equipment - net | 1,542,112 | 826,413 |
| Other assets | 642,366 | 227,249 |
| Accounts payable | (751,168) | (1,414,317) |
| Accrued liabilities | (188,107) | (826,676) |
| Deferred revenues | (385,625) | (144,009) |
| Long-term debt | (602,323) | (2,153,648) |
| | $ 540,035 | $(3,041,216) |

Liabilities of the Internet Services Group to be retained by the Company as of June 30, 1998, and included in the amounts listed above, are $201,168 included in accounts payable, $15,326 included in accrued liabilities, $327,354 included in deferred revenues and $130,312 included in long-term debt.

Revenues from discontinued were $2,711,114 and $2,302,913 for the years ended June 30, 1998 and 1997, respectively.

Under generally accepted accounting principles, a provision for loss on discontinued operations has been included based upon management's best estimates of the amounts expected to be realized on the sale.

NOTE 7:    SALE OF COMMON STOCK

During the year the Company issued 4,917,000 restricted shares of common stock to certain accredited investors in two private transactions exempt from registration under federal and state securities laws. In connection with these offerings the Company also issued warrants to purchase 2,298,850 shares of common stock at $1.85 per share, expiring in various amounts on September 30, 1998 and March 13, 1999. The net proceeds to the Company from these two offerings was approximately $5,750,000.

NOTE 8:    STOCK OPTION PLAN AND COMMON STOCK WARANTS

The Company's 1996 Stock Incentive Plan (the "1996 Plan") provides for the granting  to officers, key employees, and to non-employee consultants and independent contractors of non-qualified stock options, incentive stock options, and restricted stock awards. For incentive stock options, the option price cannot be less than the fair market value of the common stock at the date of grant. Non-qualified stock options may be granted at less than the fair market value of the common stock. Options become exercisable at the rate of 25% per year and

Page 37 of 57

<PAGE>

expire ten years from the date of grant. Options may be exercisable as determined by the committee of the Board of Directors that administers the Plan. Restricted Stock Awards (RSA's) may be granted or sold to officers and key employees. RSA's may not be sold or otherwise disposed of during the established restriction periods. No RSA's have been currently granted.

The committee of the Board of Directors that administers the Plans may, at its discretion, determine the number of shares, the purchase price, applicable vesting periods, and any other terms of each option or award.

No options, awards or grants were made during 1997. Information relating to stock option activity during the year and as of June 30, 1998 is as follows:

| | Shares Under Option | Shares Available for future Option or Award | Price Range |
|---|---|---|---|
| Outstanding, 1997 | – | 3,000,000 | |
| Granted | 1,050,000 | (1,050,000) | $ 2.00 - $ 2.00 |
| Exercised | – | – | |
| Canceled | – | – | |
| Outstanding, 1998 | 1,050,000 | 1,950,000 | |
| | ========== | =========== | |
| Exercisable, 1998 | 262,500 | | |

==========

All issued and outstanding options are incentive stock options.  No
compensation expense has been recorded in the financial statements related
to stock option grants for either 1998 or 1997, as the option exercise
prices were equal to the fair market value of the stock on the date of
grant.

Pro-forma information regarding net income and loss per share is required
under the provisions of FASB 123, and has been determined as if the Company
had accounted for its employee stock options under the fair value method of
that Statement.  The fair value for these options was estimated at the date
of grant using the Black-Scholes option-pricing model with the following
weighted average assumptions for 1998, the only year options have been
granted.

| | |
|---|---|
| Risk free interest rate | 5.5% |
| Dividend yield | 0.0% |
| Volatility factor | 135% |
| Weighted average expected life | 4 years |

Page 38 of 57

<PAGE>

The Black-Scholes option-pricing model was developed for use in estimating
the fair value of traded options that have no vesting restrictions and are
fully transferable.  In addition, option valuation models require the input
of highly subjective assumptions including the expected future stock price
volatility.  Because the Company's employee stock options have
characteristics significantly different from those of traded options, and
because changes in the subjective input assumptions can materially affect
the fair value estimate, in management's opinion, the existing models do
not necessarily provide a reliable single measure of the fair value of its
employee stock options.

For purposes of pro forma disclosures, the estimated fair value of options
is assumed to be amortized to expense over the option's vesting period.
The Company's pro forma net loss and net loss per share were as follows:

| | 1998 |
|---|---|
| Net loss as reported | $ (7,333,738) |
| Pro forma net loss | $ (7,683,738) |
| | |
| Net loss per share as reported | $      (1.12) |
| Pro forma net loss per share | $      (1.17) |

As of June 30, 1998 the Company had outstanding common stock purchase
warrants as follows (no warrants were exercised, cancelled or expired
during the year):

| Expiry Date | Exercise Price | No. of Warrants | Cash Available from Exercise |
|---|---|---|---|
| September 1998 | $  1.85 | 496,000 | $   917,600 |
| December 1998 | 2.04 | 100,000 | 204,000 |

| | | | |
|---|---|---|---|
| March 1999 | 1.85 | 1,802,850 | 3,335,273 |
| June 1999 | 2.04 | 100,000 | 204,000 |
| December 1999 | 2.04 | 100,000 | 204,000 |
| September 2001 | 1.81 | 65,000 | 117,650 |
| | | ---------- | ----------- |
| | | 2,663,850 | $ 4,982,523 |

The holders of warrants, each acting on their own will most likely consider
a number of factors before exercising. Among those factors that could be
considered will be the current market value of the Company's common stock
on or around the exercise date and the prospects for the Company going
forward. There can be no assurances that warrant holders will exercise
their rights and

Page 39 of 57

<PAGE>

purchase additional shares from the Company. Holders of warrants expiring
in September 1998 did not elect to exercise their rights to purchase
additional common stock shares.

NOTE  9:  RECEIVABLES

| | 1998 | 1997 |
|---|---|---|
| | ---- | ---- |
| Trade receivables | $  333,997 | $  539,714 |
| Allowance for doubtful accounts | (120,000) | (306,000) |
| Other receivables | 3,230 | 139,502 |
| | ---------- | ---------- |
| | $  217,227 | $  373,216 |
| | ========== | ========== |

Long-term receivables consists of notes receivable from Value Added
Resellers (VARs) who had purchased the rights to various sales territories
for the Company's discontinued Internet Service Operations. The notes
carried terms of 12 to 36 months and interest rates ranging from 0% to 18%.
Due to the uncertain nature of the ultimately collectability of the VAR
notes, the Company established an offsetting deferred revenue. Earnings
from the sale of territorial rights are recognized as cash payments on the
notes are received. As part of the negotiations held in connection with the
sale of the Internet Service Operations, the Company agreed to retain the
notes receivable and related offsetting deferred revenue accounts.

NOTE  10:  PROPERTY AND EQUIPMENT

| | Estimated Useful Life (in years) | 1998 | 1997 |
|---|---|---|---|
| | ----------- | ---- | ---- |
| Automobiles | 5 | $   30,306 | $   61,031 |
| Equipment | 3-5 | 1,886,974 | 747,251 |
| Furniture and fixtures | 3-10 | 240,566 | − |
| Leasehold improvements | Asset or lease life | 107,823 | 12,372 |
| Assets under capital leases | Asset or lease life | 708,740 | 273,919 |
| | | ---------- | ---------- |
| | | $2,974,409 | $1,094,573 |
| Less acumulated depreciation and amortization | | (608,224) | (268,160) |

```
                                       ----------   ----------
                                       $2,366,185   $  826,413
                                       ==========   ==========
Depreciation and amortization expense for period  $  340,064   $  195,467
                                       ==========   ==========
```

Page 40 of 57

<PAGE>

    Included in depreciation and amortization expense is amortization related
    to assets under capital leases of $106,275 and $50,574 for the years ended
    June 30, 1998 and 1997, respectively.


NOTE  11:  OTHER ASSETS

    Other assets consist primarily of goodwill associated with the excess of
    the costs of acquisitions over the book value of assets acquired.

                            Page 41 of 57

<PAGE>

<TABLE>
<CAPTION>
<S>                                                                    <C>
NOTE  12:  LONG-TERM DEBT

          NOTES PAYABLE:
            Payable to Bank, due January 1999, interest only at Prime,
                guaranteed by a related party until October 1999              $

            Payable to related party, interest only payments at 8%
                until March 1999, then monthly payments of principal
                and interest of $23,192 through March 2003

            Payable to related party converted into equity during year

            Payable to founders & former shareholders of Monitrx,
                payable in monthly installments of principal & interest
                at 8.5% through September 1999

            Payable to Company owned by former shareholders
                of Monitrx, payable in monthly installments of
                principal & interest at 8.5% through September 1999

            Vehicle Loan, 11.0%, secured by vehicle and payable
                in monthly installments of $581 to March 2002

            Other

          CAPITAL LEASE OBLIGATIONS:
            10.2%, Secured by related equipment, guaranteed by
                related party and payable in monthly installments
                of $12,101 to February 2001

            16.6% - 20.2%, secured by related equipment,
                guaranteed by current and / or former officers
                of the Company and payable in various monthly
```

```
                    installments to March 2001

      10.0% - 19.2%, secured by related equipment and
              payable in various monthly installments to May 2001
                                                               ------
                                                               $

      Less current portion                                    ------
                                                               $
                                                               ======
```

Long-term debt maturities for fiscal years ending June 30 are as follows:
$487,020 for 2000; $344,478 for 2001; $256,453 for 2002; and $201,939 for
2003.

</TABLE>

<center>Page 42 of 57</center>

<PAGE>

NOTE 13:  SHAREHOLDERS' EQUITY

The Company has authorized the issuance of up to 50,000,000 shares of
common stock, with a par value of $0.001 per share.  There were 12,834,183
and 3,707,573 shares issued and outstanding as of June 30, 1998 and 1997,
respectively.

NOTE 14:  LEASING ARRANGEMENTS

The Company leases certain office facilities and equipment.  Rental expense
for the years ended June 30, 1998 and 1997, were $307,101 and $27,301,
respectively.

Future minimum lease payments as of year-end under capital leases and non-
cancelable operating leases, having initial lease terms of more than one
year, are as follows:

|                                        | Capital Leases | Operating Leases |
|----------------------------------------|---------------:|-----------------:|
| 1999                                   | $    288,312   | $    391,219     |
| 2000                                   |      196,745   |      375,019     |
| 2001                                   |      110,741   |      383,523     |
| 2002                                   |         –      |      402,988     |
| 2003                                   |         –      |      411,544     |
| Thereafter                             |         –      |      247,055     |
| Total minimum lease payments           | $    595,798   | $  2,211,348     |
| Amounts representing interest          | $     76,452   |                  |
| Present value of net minimum lease payments | $  519,346 |                  |

The present value of net minimum lease payments is presented in the balance
sheet as a portion of long-term debt.

NOTE 15:  INCOME TAXES

The Company has available net operating loss (NOL) carryforwards of
approximately $10,728,000, the benefits of which will expire in various
amounts through 2013.  NOLs will only be usable to the extent that the
Company is successful in obtaining future profitability, or incurring
profitable transactions.


NOTE  16:  RISKS AND UNCERTAINTITIES

<PAGE>

   With the sale of its Internet Service Group, the Company has focused its
operations on its ability to develop and effectively bring to market high
technology software products to meet its customers needs in the home health
care industry.  In the competitive market environment in which the Company
intends to operate, software development and marketing processes are
uncertain and complex, requiring successful management of various
development and marketing risks.  The Company's ability to continue to
attract the appropriate number and quality of software development and
senior management personnel and to successfully introduce its products to
the market place, could impact its ability to capture market share.

   The Company's products have been developed with full recognition of the
pending new millennium, however acceptance of the Company's products may be
impacted by adverse Year 2000 problems by potential customers.

   Additionally, the health care industry in general, as well as the home
health care segment, is undergoing significant and rapid changes.

   In light of these factors, it is reasonably possible that failure to
successfully manage software development, failure to successfully introduce
products to market, uncontrollable failures of internal computer systems at
potential customer sites, or the Company's failure to adopt to a rapidly
changing business environment could have severe near-term impacts on the
Company's prospects for growth.


NOTE  17:  COMMITMENTS AND CONTINGENCIES

   The Company is party to a lawsuit involving one of its Value Added
Resellers (VAR) associated with the operations of the discontinued Internet
Services Group, and its Televar subsidiary.  Under the terms of the
agreement to sell Televar, the Company agreed to keep this legal matter.
The dispute relates to ownership of certain equipment used in the Internet
operations as well as ownership of customer accounts of one of the
Company's forty Internet operating sites.  The two parties have agreed to
mediation in an attempt to resolve the matter.

   In the opinion of management, the outcome of such current legal proceeding
can not be known at this time. The matter could have a material effect on
the Company's cash flows when resolved, however it is not expected to have
a material effect on the Company's results of operations or financial
position.


NOTE  18:  SUPPLEMENTAL CASH FLOW INFORMATION

<PAGE>

|                                                   |   | 1998 |   | 1997 |
|---|---|---|---|---|
| Cash Paid During the Year For:                    |   | ---- |   | ---- |
|   Interest                              | $ | 108,047 | $ | 145,067 |
|   Income Taxes                          |   | — |   | — |
|                                                   |   |   |   |   |
| Non-Cash Investing and Financing Transactions     |   |   |   |   |
|   Acquisition of Subsidiaries:          |   |   |   |   |
|     Fair value of assets acquired, other than cash | $ | 5,248,572 |   | — |
|     Liabilities assumed       | $ | 3,326,898 |   | — |
|                                                   |   | ------------ |   | ------------ |
|     Common stock issued       | $ | 8,575,470 |   | — |
|                                                   |   | ============ |   | ============ |
|                                                   |   |   |   |   |
|   Conversion of Related Party Debt to Equity | $ | 4,219,418 |   | — |
|                                                   |   |   |   |   |
|   Assumption of Note Payable to Related Party | $ | 950,000 |   | — |
|                                                   |   |   |   |   |
|   Equipment Acquired under Capital Leases | $ | 434,821 | $ | 189,679 |
|                                                   |   |   |   |   |
|   Stock Issued in Settlement of Debt    | $ | 52,000 | $ | 45,000 |

NOTE 19:   SUBSEQUENT EVENTS

On August 20, 1998 the Company received approximately $840,000 in partial net proceeds from a private equity offering.  The Company anticipates receiving additional funds under this offering.  In the event that the offering is fully subscribed it is anticipated that the net proceeds to the Company would be approximately $1,400,000.

The Company is continuing discussions to secure additional financing. Notwithstanding the receipt of funds in connection with the above mentioned August financing, the Company requires additional funds to continue operations.  There can be no assurance that the Company will be successful in its efforts to attract additional financing.

On September 28, 1998 the Company completed a transaction whereby it sold substantially all of the assets and most of the liabilities of its 100% owned subsidiary, Televar, Inc. to the Boss Internet Group.  The transaction is more fully described in Note 6 "Discontinued Operations".

<PAGE>

PART III

Item 9.   Directors, Executive Officers, Promoters and Control Persons; Compliance with Section 16(a) of the Exchange Act

Directors and Executive Officers

<TABLE>
<CAPTION>

| Name | Age | Position with Company |
| - --------------------- | --- | ------------------------------------------------ |
| <S> | <C> | <C> |

```
Roger P. Vallo              62    President, Chief Executive Officer, Director
Benoit Demeulemeester       34    Director
Donald Cotton               59    Director
Michael Hendrickson         52    Director
William F. Davis            65    Director
Douglass H. Ebstyne         55    Director
</TABLE>
```

Roger P. Vallo

     Mr. Vallo has been a director of the Company since August 1996 and the
President and CEO of the Company since April 15, 1997.  Prior to that time, he
was a director of Televar.  Mr. Vallo was a founder and former president and
chief executive officer of Telematic Products, Inc., which developed,
manufactured and marketed a line of billing computers.  He was a director of
PA&E and its predecessors from May 1990 until 1998. Mr. Vallo served as a
director of Pacific Coast Technologies, Inc., from February 1991 to November
1995 and as Secretary of that company from July 1993 to October 1994.  Mr. Vallo
also is a director of Prudential Preferred Properties, a real estate company
located in Everett, Washington.

Benoit Demeulemeester

     Mr. Demeulemeester is a founding partner of CAMCO AG, a Zurich, Switzerland
based independent portfolio management company.  Prior to forming CAMCO in 1991,
Mr. Demeulemeester was a manager of the Equity Derivatives Group at Swiss Bank
Corporation International in London, with responsibility for institutional
clients in Italy and France.  Previously he worked for Merrill Lynch Capital
Markets in London and Zurich, where he was responsible for the creation and sale
of structured derivative products to Swiss institutional clients.  Prior to that
he worked in the Fixed Income Department of Shearson Lehman Amex Finance in
Geneva.  Mr. Demeulemeester holds the International Securities Markets
Association diploma and is a licensed securities dealer in the US.  He is also a
registered Securities and Futures Authority in the United Kingdom.  In addition,
he sits on the board of the International Menuhin Music Academy Foundation.  Mr.
Demeulemeester speaks German, English, French and Italian and joined the
Company's board of directors in 1998.

Donald B. Cotton

     Mr. Cotton has been a director of the Company since August 1996.  Prior to
that time, he was a director of Televar.  He was a director of PA&E and its
predecessors from 1993 to 1998.  Mr. Cotton retired from GTE in 1993, where he
served most recently as a vice president. He is currently self-employed as a
software consultant.

Michael Hendrickson

     Mr. Hendrickson has been a director of the Company since April 4, 1997.
Mr. Hendrickson has over 25 years of experience in the insurance business with
Prudential Insurance.  He spent 22 years in management, most recently as Vice
President of Regional Marketing in the Pacific Northwest.  He is currently on
the board

                              Page 46 of 57

<PAGE>

of directors of Robodyne Corporation (Minneapolis, MN), Hendrickson Mining &
Exploration (Anchorage, AK), Advantage Video Productions (Everett, WA), and West

Coast Management Production & Capital (Bellevue, WA).  Mr. Hendrickson currently
works as a private consultant for major life insurance companies in the U.S.

William F. Davis

      Mr. Davis has been a director of the Company since June 19, 1997.
Previously he was President and CEO of DNA, a company which designs, implements
and manages data delivery networks for the health care industry.  Prior to
forming DNA, Mr. Davis was the President of Selectel Corp., a co-marketing
partner of AT&T.  From 1987 to 1992 he was founder and President of Value Added
Communications, a company which pioneered the automated operator process for
operator calls originating from public calling venues.  He also served as a Vice
President – Operations, for Telematic Products, Inc., which developed,
manufactured and marketed a line of billing computers, primarily for the Bell
Operating Company market.  From 1955 to 1983, Mr. Davis held a variety of
executive positions with GTE, a major world-wide provider of telecommunications
equipment and services.  Mr. Davis holds a BS degree from UCLA and an MBA from
the University of Connecticut.

      Directors of the Company hold office until the next annual meeting of
shareholders and until their successors have been elected and duly qualified.
Non-employee directors receive no salary for their services and receive no fee
from the Company for their participation in meetings, although all directors are
reimbursed for reasonable travel and other out-of-pocket expenses in attending
meetings of the Board.  Executive officers are elected by the Board of Directors
of the Company at the first meeting after each annual meeting of shareholders
and hold office until their successors are elected and duly qualified.

      No family relationships exist between or among any of the Company's
officers and directors.

Other Key Employees

      In addition to the directors and executive officers of the Company
identified above, the following individuals are expected to make a significant
contribution to the business of the Company.

Anthony D. Begando

      Mr. Begando is Chief Executive Officer of the Products Group.  He is an
experienced healthcare information technology leader and entrepreneur.  He has
experience in many facets of corporate management and has participated in the
formation and leadership of a number of successful early stage enterprises.  As
the CEO of the Products Group, Mr. Begando is the principal architect of the
technological and organizational infrastructure for delivery of the Company's
initial products to the market.  Prior to joining the Company as part of the
MONITRx acquisition, Mr. Begando was a managing consultant for NexGen SI, Inc.,
in Atlanta, Georgia, responsible for the operational management of an
international information technology-consulting firm.  He was also director of
information technology at CAPS, Inc. (a division of IVAX, Inc. of Irvine,
California) and responsible for the reorganization, consolidation and leadership
of the Corporate Information Technology Team.  He has also held various
positions in the software development teams of Southern California Edison
Corporation, Los Angeles, California.  Mr. Begando served with distinction in
the US military and earned a BS in Computer Information Systems from the
University of Redlands, California.

Norman Plummer

      Mr. Plummer was the founder of MONITRx and a pioneer in alternate site

(home health care and home infusion therapy) industry since the early 1980's. He is now the Vice President Administration and General Counsel of the Company. Prior to joining MONITRx, Mr. Plummer helped found, operate and later sell

Page 47 of 57

<PAGE>

Lifesource, Inc., a home healthcare conglomerate consisting of six regional pharmacy and home health nursing agencies in California.  Mr. Plummer has a law degree and is an active member of the California Bar.

Board of Director Compensation

     Directors of the Company may participate in the Company's Stock Option and Incentive Plan as discussed below under "Executive Compensation -- 1996 Stock Option and Incentive Plan."

     During the year ended June 30, 1997, the Company had no standard arrangement pursuant to which directors of the Company were compensated for any services as a director or for committee participation or special assignments performed in the capacity of director of the Company.

Employment Contracts and Termination of Employment and Change-In-Control Arrangements.

     The Company has an employment contract with its Chief Executive Officer, Roger Vallo, pursuant to the terms of which Mr. Vallo is paid a base salary of $160,000 per year and receives certain other benefits, such as insurance and a car allowance of $1,000 per month.  If the Agreement is terminated by the Company prior to the expiration of its term or for reasons other than "cause" as defined in the agreement, Mr. Vallo will receive a severance payment equal to one year's base salary.  The agreement contains covenants by Mr. Vallo concerning confidentiality and non-disclosure.  For fiscal year 1998, Mr. Vallo had the potential of receiving a bonus based on the profitability of the Company.  If all of the bonus payments were earned, options for purchase of a total of 120,000 shares of the Company's common stock will be made available to Mr. Vallo under the agreement.  There are no written employment agreements with any other executive officers of the Company.  Certain officers of the Company's operating subsidiaries hare under written contract for services provided to the subsidiaries.

COMPLIANCE WITH SECTION 16(A) OF THE EXCHANGE ACT

     Section 16(a) of the Securities Exchange Act of 1934 requires the Company's officers and directors, and persons who beneficially own more than 10 percent of a registered class of the Company's equity securities, to file reports of ownership and changes in ownership with the Securities and Exchange Commission. Officers, directors and greater than ten-percent shareholders are required by regulation of the Securities and Exchange Commission to furnish the Company with copies of all Section 16(a) forms they file.

     Based solely on its review of the copies of such forms furnished to the Company during the fiscal year ended June 30, 1997 and representations made by certain persons subject to this obligation that such filings were not required to be made, the Company believes that all of the reports required to be filed by these individuals and persons under Section 16(a) were filed in a timely manner and the Company is not aware of any filings required to be made under Section 16(a) by reporting persons of the Company which were not made for fiscal year then ended.

Item 10.   Executive Compensation

The following table sets forth certain information with respect to the compensation of the Chief Executive Officer and the only executive officer of the Company and its subsidiaries who earned $100,000 or more during the three most recent fiscal years of the Company (the "Named Officers"), ending September 30, 1996, 1995 and 1994 and the amounts earned:

Page 48 of 57

<PAGE>

Summary Compensation Table

<TABLE>
<CAPTION>

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Other Annual Compensation ($) | Long-term Compensation Awards Of Stock Options (#) |
|---|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> | <C> |
| Roger P. Vallo/(1)/ CEO/President | 1997 | $ 25,000 | $ 0 | $      0 | 0 |
| | 1998 | $160,000 | --- | $12,000/2/ | 325,000/3/ |

</TABLE>

(1)  Mr. Vallo became the Chief Executive Officer and President of the Company on April 15, 1997.

(2)  Represents a $1,000 per month car allowance.

(3)  Vest over 4 years, first year immediately vest. Exercise price of $2.00 per share.

1996 Stock Incentive Plan

    The Company's 1996 Stock Incentive Plan (the "Plan") provides for the award of incentive stock options ("ISOs") to key employees and the award of non-qualified stock options ("NSOs"), stock appreciation rights ("SARs"), bonus rights, and other incentive grants to employees and certain non-employees (other than non-employee directors) who have important relationships with the Company or its subsidiaries. The Plan has been adopted by the Board of Directors but has not been submitted to the shareholders for approval. No options or other incentive awards have been granted under the Plan.

    Administration. The Plan may be administered by the Board of Directors or
    --------------
by a committee of directors or officers of the Company. The Board of Directors has designated an Option Committee to administer the Plan. The Option Committee determines and designates the individuals to whom awards under the Plan should be made and the amount and terms and conditions of the awards, except that if officers of the Company serve on the Option Committee it may not grant options to such officers. The Option Committee may adopt and amend rules relating to the administration of the Plan, but only the Board of Directors may amend or terminate the Plan. The Plan is administered in accordance with Rule 16b-3 adopted under the Exchange Act.

    Eligibility. Awards under the Plan may be made to employees, including

Page 48 of 57

employee directors, of the Company and its subsidiaries, and to nonemployee agents, consultants, advisors, and other persons (but not including non-employee directors) that the Option Committee believes have made or will make an important contribution to the Company or any subsidiary thereof.

Shares Available. Subject to adjustment as provided in the Plan, a maximum of 3,000,000 shares of Common Stock are reserved for issuance thereunder. The maximum number of shares with respect to which options may be granted to any person during any fiscal year is 1,000,000. If an option, SAR or performance unit granted under the Plan expires or is terminated or canceled, the unissued shares subject to such option, SAR or performance unit are again available under the Plan. In addition, if shares sold or awarded as a bonus under the Plan are forfeited to the Company or repurchased thereby, the number of shares forfeited or repurchased are again available under the Plan.

Term. Unless earlier terminated by the Board, the Plan will continue in effect until the earlier of: (i) ten years from the date on which the Plan is adopted by the Board, and (ii) the date on which all shares available for issuance under the Plan have been issued and all restrictions on such shares have lapsed. The Board may suspend or terminate the Plan at any time except with respect to options, performance units, and shares subject to restrictions then outstanding under the Plan.

Stock Option Grants. The Option Committee may grant ISOs and NSOs under the Plan. With respect to each option grant, the Option Committee determines the number of shares subject to the option, the option price, the period of the option, the time or times at which the option may be exercised (including whether the option will be subject to any vesting requirements and whether there will be any conditions precedent to exercise of the option), and the other terms and conditions of the option.

ISOs are subject to special terms and conditions. The aggregate fair market value, on the date of the grant, of the Common Stock for which an ISO is exercisable for the first time by the optionee during any calendar

Page 49 of 57

<PAGE>

year, may not exceed $100,000. An ISO may not be granted to an employee who possesses more than 10% of the total voting power of the Company's stock unless the option price is at least 110% of the fair market value of the Common Stock subject to the option on the date it is granted and the option is not exercisable five years after the date of grant. No ISO may be exercisable after ten years from the date of grant. The option price may not be less than 100% of the fair market value of the Common Stock covered by the option at the date of grant.

In general, no vested option may be exercised unless at the time of such exercise the optionee is employed by or in the service of the Company or any subsidiary thereof, within 12 months following termination of employment by reason of death or disability, or within three months following termination for any other reason except for cause. Options are nonassignable and nontransferable by the optionee except by will or by the laws of descent and distribution at the time of the optionee's death. No shares may be issued pursuant to the exercise of an option until full payment therefor has been made. Upon the exercise of an

option, the number of shares reserved for issuance under the Plan will be reduced by the number of shares issued upon exercise of the option. As of September 30, 1996, no options to purchase shares of Common Stock have been granted under the Plan.

   Stock Appreciation Rights. The Option Committee may grant SARs under the
   ------------------------
Plan. Each SAR entitles the holder, upon exercise, to receive from the Company an amount equal to the excess of the fair market value on the date of exercise of one share of Common Stock of the Company over its fair market value on the date of grant (or, in the case of a SAR granted in connection with an option, the excess of the fair market value of one share of Common Stock of the Company over the option price per share under the option to which the SAR relates), multiplied by the number of shares covered by the SAR or the option. Payment by the Company upon exercise of a SAR may be made in Common Stock, in cash, or by a combination of Common Stock and cash.

   If a SAR is granted in connection with an option, the following rules shall apply: (i) the SAR shall be exercisable only to the extent and on the same conditions that the related option could be exercised; (ii) the SAR shall be exercisable only when the fair market value of the stock exceeds the option price of the related option; (iii) the SAR shall be for no more than 100% of the excess of the fair market value of the stock at the time of exercise over the option price; (iv) upon exercise of the SAR, the option or portion thereof to which the SAR relates terminates; and (v) upon exercise of the option, the related SAR or portion thereof terminates.

   Each SAR is nonassignable and nontransferable by the holder except by will or by the laws of descent and distribution at the time of the holder's death. Upon the exercise of a SAR for shares, the number of shares reserved for issuance under the Plan will be reduced by the number of shares issued. Cash payments of SARs will not reduce the number of shares of Common Stock reserved for issuance under the Plan. No SARs have been granted under the Plan.

   Restricted Stock. The Option Committee may issue shares of Common Stock
   ----------------
under the Plan subject to the terms, conditions, and restrictions determined thereby. Upon the issuance of restricted stock, the number of shares reserved for issuance under the Plan shall be reduced by the number of shares issued. No restricted shares have been granted under the Plan.

   Stock Bonus Awards. The Option Committee may award shares of Common Stock
   ------------------
as a stock bonus under the Plan. The Option Committee may determine the recipients of the awards, the number of shares to be awarded, and the time of the award. Stock received as a stock bonus is subject to the terms, conditions, and restrictions determined by the Option Committee at the time the stock is awarded. No stock bonus awards have been granted under the Plan.

   Cash Bonus Rights. The Option Committee may grant cash bonus rights under
   -----------------
the Plan in connection with (i) options granted or previously granted, (ii) SARs granted or previously granted, (iii) stock bonuses awarded or previously awarded, and (iv) shares issued under the Plan. Bonus rights granted in connection with options entitle the optionee to a cash bonus if and when the related option is exercised. The amount of the bonus is determined by multiplying the excess of the total fair market value of the shares acquired upon the exercise

<PAGE>

over the total option price for the shares by the applicable bonus percentage.
The bonus rights granted in connection with a SAR entitle the holder to a cash
bonus when the SAR is exercised. The amount of the bonus is determined by
multiplying the total fair market value of the shares or cash received pursuant
to the exercise of the SAR by the applicable percentage. The bonus percentage
applicable to any bonus right is determined by the Option Committee but may in
no event exceed 75%. Bonus rights granted in connection with stock bonuses
entitle the recipient to a cash bonus, in an amount determined by the Option
Committee, when the stock is awarded or purchased or any restrictions to which
the stock is subject lapse. No bonus rights have been granted under the Plan.

        Performance Units. The Option Committee may grant performance units
        -----------------
consisting of monetary units which may be earned if the Company achieves certain
goals established by the Committee over a designated period of time.  The goals
established by the Option Committee may include earnings per share, return on
shareholders' equity, return on invested capital, and similar benchmarks.
Payment of an award earned may be in cash or in Common Stock or partly in both,
and may be made when earned, or vested and deferred, as the Option Committee
determines. Each performance unit will be nonassignable and nontransferable by
the holder except by will or by the laws of descent and distribution at the time
of the holder's death. The number of shares reserved for issuance under the Plan
shall be reduced by the number of shares issued upon payment of an award. No
performance units have been granted under the Plan.

        Changes in Capital Structure. The Plan provides that if the outstanding
        ----------------------------
Common Stock of the Company is increased or decreased or changed into or
exchanged for a different number or kind of shares or other securities of the
Company or of another corporation by reason of any recapitalization, stock split
or certain other transactions, appropriate adjustment will be made by the Option
Committee in the number and kind of shares available for grants under the Plan.
In addition, the Option Committee will make appropriate adjustments in the
number and kind of shares as to which outstanding options will be exercisable.
In the event of a merger, consolidation or other fundamental corporate
transformation, the Board may, in its sole discretion, permit outstanding
options to remain in effect in accordance with their terms; to be converted into
options to purchase stock in the surviving or acquiring corporation in the
transaction; or to be exercised, to the extent then exercisable, during a 30-day
period prior to the consummation of the transaction.

Certain Tax Considerations Related to Executive Compensation

        As a result of Section 162(m) of the Internal Revenue Code of 1986, as
amended, in the event that compensation paid by the Company to a "covered
employee" (the chief executive officer and the next four highest paid employees)
in a year were to exceed an aggregate of $1,000,000, the Company's deduction for
such compensation could be limited to $1,000,000.

                              Page 51 of 57
<PAGE>

Item 11.  Security Ownership of Certain Beneficial Owners and Management

        The following table summarizes certain information as of June 29, 1998 with
respect to the beneficial ownership of the Company's Common Stock (i) by the
Company's officers and directors, (ii) by stockholders known by the Company to
own 5 percent or more of the Company's Common Stock and (iii) by all officers

and directors as a group. At October 7, 1998, there were 12,778,407 shares of
Common Stock issued and outstanding.

<TABLE>
<CAPTION>

| Name and Address of 5% Beneficial Owners, Executive Officers and Directors/1/ | Number of Shares of Common Stock Beneficially Owned at October 7, 1998/2/ |
|---|---|
| `<S>` | `<C>` |
| **5% Beneficial Owners:** | |
| Pacific Aerospace & Electronics, Inc. | 2,289,309 |
| Lombard Odier & Cie | 1,983,250/4/ |
| Banca Popolare Fruliadua | 1,287,250/5/ |
| CAMCO BVI | 910,000/6/ |
| **Dirctors** | |
| Benoit Demeulmeester, Director | 1,142,500/7/ |
| Roger Vallo, President and Director and CEO | 370,365/8/ |
| Donald B. Cotton, Director | 259,115 |
| William Davis, Director and VP Corp. Development | 55,500 |
| Michael Hendrickson, Director | 85,000 |
| **Non-Director Executive Officers** | |
| Norman Plummer, VP Administration and General Counsel | 381,113/9/ |
| Anthony Begando, President Products Group | 140,794/10/ |
| Officers and Directors as a Group (5 persons) | 1,912,480 |

        (*) Less than 1 percent

</TABLE>

- -------------------------------------
/1/  Unless otherwise indicated, the business address of the individual or
person named is the same as the Company.

/2/  Beneficial ownership is determined in accordance with the rules of the
Securities and Exchange Commission. To the Company's knowledge, each person or
entity has sole voting and sole investment power with respect to the shares
beneficially owned except as note in the footnotes below, subject to community
property laws, where applicable.

/3/  Rounded to the nearest 1/10th of one percent, based on 12,778,407 shares of
Common Stock outstanding on October 7, 1998.

/4/  Includes presently exercisable stock purchase warrants to acquire 437,500
shares of Common Stock.

/5/  Includes presently exercisable stock purchase warrants to acquire 325,000
shares of Common Stock.

/6/  Includes presently exercisable stock purchase warrants to acquire 260,000
shares of Common Stock.

/7/  Mr. Demeulmeester is a partner in CAMCO AG, which in turn is an affiliate
of CAMCO BVI. Amount shown includes 650,000 shares held in the name of CAMCO BVI
and options to purchase 260,000 shares held by CAMCO BVI, as well as options to
acquire 232,500 shares held by CAMCO AG.

/8/  Includes presently exercisable stock options to purchase 81,250 shares of
Common Stock.

/9/  Includes presently exercisable stock options to purchase 75,000 shares of
Common Stock.

/10/ Includes presently exercisable stock options to purchase 62,500 shares of
Common Stock.

<center>Page 52 of 57</center>

<PAGE>

Related Party Transactions

     An officer and director of the Company and a director of the Company were,
until January 1998, directors of PA&E.  Both are also shareholders of PA&E.  In
addition, PA&E's Chief Executive Officer and President (CEO), as well as its
Chief Financial Officer (CFO) and certain members of the CFO's family are, or
were, shareholders of the Company.  Until June 1997, PA&E's CEO and CFO were
directors of the Company.  A shareholder of the Company, who currently owns
about 2.6% of the Company's stock is a director and shareholder of PA&E.  As of
September 15, 1998, PA&E is the beneficial owner of approximately 17.9% of the
Company's outstanding common stock.

     The Company subleases from PA&E approximately 20,000 square feet of a newly
constructed office building situated in Bothell, Washington, which serves as the
Company's corporate headquarters, and primary office facility.  The Company
believes that the terms and conditions of the lease, and sub-lease, are at
prevailing market rates and terms in the suburban Seattle area in which the
building is located.

     Certain officers and  directors and shareholders of both the Company and
PA&E have each personally guaranteed certain obligations of the Company or its
subsidiaries.

     PA&E has agreed to guarantee certain of the Company's debt instruments,
including a loan from a Bank in the amount of $1,215,765 and equipment under a
capital lease with the sum of the original payments totaling approximately
$373,421.  In addition, the Company owes PA&E $950,000 under the terms of a loan
executed at the time of the Company's debt restructuring.

     During the year the Company paid $55,000 in consulting fees to a company
whose president was simultaneously the President of Televar, Inc.  The former
Televar President resigned effective September 1997.  In a subsequent complaint
and cross-complaint, the former President and the Company each alleged certain
matters.  The matters were mediated in April 1998, with the Company paying the
former President $125,000 to settle the case.

     Orca presently holds a $250,000 note receivable from a company in which an
officer, director and shareholder of Orca along with another director and
shareholder of Orca, are also officers, directors and shareholders.  In
addition, as of June 30, 1998 Orca has provided approximately $42,000 in
unreimbursed administrative services to the company.  These amounts have been
fully reserved in Company's financial statements.

As a result of the acquisition of MONITRX, the Company assumed certain notes payable, totaling about $500,000, to former shareholders of MONITRx, who are now officers or former officers of the Company. The notes require monthly payments of principal and interest over the next three years. In addition, the notes require the Company to make principal payments in an amount equal to 6% of the proceeds from new common stock equity offerings, until such time as the notes are fully repaid.

The Company has made various advances, in the form of notes receivable, to certain officers and other key employees in connection with the relocation of former MONITRx employees to the Company's Bothell, Washington facility. The notes total about $150,000, are non-interest bearing and are to be repaid out of future earnings of the acquired operations. As of June 30, 1998 the notes have been fully reserved.

Item 13.  Exhibits and Reports on Form 8-K

<div align="center">Page 53 of 57</div>

<PAGE>

(a)  Exhibits
     --------

<TABLE>
<CAPTION>

| Exhibit Number | Description |
| -------------- | ----------------------------------------- |
| <S> | <C> |
| 3.1 | Articles of Incorporation of Jungle Street, Inc., as filed with the Secretary of State of the State of Utah on July 10, 1980. (Previously filed) |
| 3.2 | Articles of Amendment to the Articles of Incorporation of Jungle Street, Inc., filed with the Secretary of State of the State of Utah on July 20, 1995. (Previously filed) |
| 3.3 | Bylaws of Jungle Street, Inc. (Previously filed) |
| 4.1 | Subscription Agreement, dated May 10, 1996, between Televar Northwest, Inc. and Gary Arsenault. (incorporated by reference to Form 10-KSB filed for the year ended June 30, 1996). |
| 4.2 | Registration Rights Agreement, dated September 25, 1996, between Jungle Street, Inc. and UTCO Associates, Ltd. (incorporated by reference to Form 10-KSB filed for the year ended June 30, 1996). |
| 4.3 | Common Stock Purchase Warrant, dated September 25, 1996, issued to UTCO Associates, Ltd. by Jungle Street, Inc. (incorporated by reference to Form 10-KSB filed for the year ended June 30, 1996). |
| 4.4 | Agreement and Plan of Merger, dated August 29, 1996, among Jungle Street, Inc., Televar Northwest, Inc., and Jungle Street, Inc., a Washington corporation (incorporated by reference to Current Report on Form 8-K filed on September 13, 1996). |

10.1       Convertible Promissory Note from Televar Northwest, Inc., to
           BarbJorgensen, dated April 25, 1996. (incorporated by
           reference to Form 10-KSB filed for the year ended June 30).

10.2       Promissory Note from Jungle Street, Inc. to UTCO Associates,
           Ltd., dated September 25, 1996. (incorporated by reference
           to Form 10-KSB filed for the year ended June 30).

10.3       Security Agreement, dated September 25, 1996, between Jungle
           Street, Inc., Televar Northwest, Inc., and UTCO Associates,
           Ltd. (incorporated by reference to Current Report on Form
           8-K filed on September 13, 1996).

10.4       Guarantee of Loan, dated September 24, 1996, by Televar
           Northwest, Inc., Charles D. DeJong, and Mark D. Hamilton in
           favor of UTCO Associates, Ltd. (incorporated by reference
           to Current Report on Form 8-K filed on September 13, 1996).

10.5       1996 Stock Incentive Plan (incorporated by reference to
           Current Report on Form 8-K filed on September 13, 1996).
</TABLE>

                          Page 54 of 57

<PAGE>

<TABLE>
<S>                <C>
10.6       Customer Provided Access Request and Authorization, dated
           June 3, 1996, between Televar Northwest, Inc., and Sprint
           Communications Company L.P. (incorporated by reference to
           Current Report on Form 8-K filed on September 13, 1996).

10.7       Dedicated Access Charges and Special Access Surcharge
           Application for Exemption, dated June 3, 1996, between
           Televar Northwest, Inc., and Sprint Communications Company,
           L.P. (incorporated by reference to Current Report on Form 8-
           K filed on September 13, 1996).

10.8       Lease Agreement and Guarantee, dated August 6, 1996, between
           Televar Northwest, Inc., and Financial Pacific Co.
           (incorporated by reference to Current Report on Form 8-K
           filed on September 13, 1996).

10.9       Lease Agreement, dated July 26, 1993, between Televar
           Northwest, Inc., and E. Gus Noyd and Laura Jean Noyd.
           (incorporated by reference to Current Report on Form 8-K
           filed on September 13, 1996).

10.10      Lease Agreement, dated June 28, 1995, between Televar
           Northwest, Inc., and Cascade Leasing Company, and Equipment
           Lease Guaranty made by Charles D. DeJong, Michael P.
           Schuyleman, and Mark D. Hamilton in favor of Cascade Leasing
           Company (incorporated by reference to Current Report on Form
           8-K filed on September 13, 1996).

10.11      Sublease Agreement, dated April 1, 1995, between Televar
           Northwest, Inc., and Telewaves, Inc. (incorporated by
           reference to Current Report on Form 8-K filed on September
           13, 1996).

10.12        Lease Agreement, dated March 7, 1995, between Televar Northwest, Inc., and David A. Quick and Cirri A. Quick, d/b/a DCR Properties (incorporated by reference to Current Report on Form 8-K filed on September 13, 1996).

10.13        Lease Agreement, effective July 15, 1996, between Televar Northwest, Inc., and Summit Leasing, Inc.  (incorporated by reference to Current Report on Form 8-K filed on September 13, 1996).

10.14        Promissory Note from Televar Northwest, Inc., to Michael P. Schuyleman and Janet L. Schuyleman, dated November 1, 1995 (incorporated by reference to Current Report on Form 8-K filed on September 13, 1996).

10.15        Escrow Account Instructions and Agreement, dated October 31, 1995, between David M. Bohr, Michael P. Schuyleman and Janet L. Schuyleman, and Televar Northwest, Inc. (incorporated by reference to Current Report on Form 8-K filed on September 13, 1996).

10.16        Asset Purchase Agreement with Digital Network Associates, dated February 17, 1998, (incorporated by reference to Report on Form 8-K, filed March 5, 1998).

</TABLE>

Page 55 of 57

<PAGE>

<TABLE>
<S>                     <C>
10.17        Asset Purchase Agreement with MONITRX, Inc., incorporated by reference to Current Report on Form 8-K, filed March 22, 1998.

27        Financial Data Schedule
</TABLE>

Page 56 of 57

<PAGE>

SIGNATURES

In accordance with Section 13 or 15(d) of the Exchange Act, the registrant caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

ORCA TECHNOLOGIES, INC.

Date: October 13, 1998        By  /s/ Roger P. Vallo
                                    -----------------------------------
                                    Chief Executive Officer

In accordance with the Exchange Act, this report has been signed below by the following persons on behalf of the registrant and in the following

capacities on October 13, 1998.

```
<TABLE>
<CAPTION>

Signature                              Title
- -----------                          -----
<S>                                    <C>

/s/ Roger P. Vallo                     Chief Executive Officer, and
- ---------------------------------      Chairman of the Board (Principal
Roger P. Vallo                         Executive and Accounting Officer)



                                       Director
- ---------------------------------
Donald B. Cotton


/s/ William F. Davis                   Director
- ---------------------------------
William F. Davis



                                       Director
- ---------------------------------
Michael Hendrickson


/s/ Benoit Demeulmeester               Director
- ---------------------------------
Benoit Demeulmeester


</TABLE>

                          Page 57 of 57
</TEXT>
</DOCUMENT>
<DOCUMENT>
<TYPE>EX-27
<SEQUENCE>2
<DESCRIPTION>FINANCIAL DATA SCHEDULE
<TEXT>

<TABLE> <S> <C>

<PAGE>
<ARTICLE> 5
<CIK> 0001004932
<NAME> ORCA TECHNOLOGIES, INC.

<S>                                    <C>
<PERIOD-TYPE>                                    YEAR
<FISCAL-YEAR-END>                         JUN-30-1998
<PERIOD-START>                            JUL-01-1997
<PERIOD-END>                              JUN-30-1998
<CASH>                                        472,754
```

```
<SECURITIES>                              0
<RECEIVABLES>                       441,825
<ALLOWANCES>                        224,598
<INVENTORY>                          36,728
<CURRENT-ASSETS>                    809,855
<PP&E>                            2,994,409
<DEPRECIATION>                      608,224
<TOTAL-ASSETS>                    7,674,890
<CURRENT-LIABILITIES>             4,816,494
<BONDS>                                   0
<PREFERRED-MANDATORY>                     0
<PREFERRED>                               0
<COMMON>                             12,834
<OTHER-SE>                        1,555,672
<TOTAL-LIABILITY-AND-EQUITY>      7,674,890
<SALES>                                   0
<TOTAL-REVENUES>                          0
<CGS>                                     0
<TOTAL-COSTS>                    (3,493,139)
<OTHER-EXPENSES>                          0
<LOSS-PROVISION>                    189,598
<INTEREST-EXPENSE>                  248,685
<INCOME-PRETAX>                  (3,716,666)
<INCOME-TAX>                              0
<INCOME-CONTINUING>              (3,716,666)
<DISCONTINUED>                   (3,617,072)
<EXTRAORDINARY>                           0
<CHANGES>                                 0
<NET-INCOME>                     (7,333,738)
<EPS-PRIMARY>                         (1.12)
<EPS-DILUTED>                         (1.12)


</TABLE>
</TEXT>
</DOCUMENT>
</SEC-DOCUMENT>
-----END PRIVACY-ENHANCED MESSAGE-----
```